DOROTHY BARBER v. TIME, INCORPORATED, a Corporation, Appellant.— 159 S. W. (2d) 291.

Division One, February 26, 1942.

*Hurd & Vineyard, Cravath, DeGersdorff, Swaine & Wood* and *John F. Harding* for appellant.

*Allan R. Browne* and *Ralph E. Griffith* for respondent.

HYDE, C.—This is an action for damages based on violation of plaintiff's right of privacy by publishing an article (with her picture) about a physical ailment for which she was being treated in a hospital. The jury returned a verdict for plaintiff for $1500 actual

and $1500 punitive damages. Defendant has appealed from the judgment entered thereon, and says it was error to refuse its request for a peremptory instruction in the nature of a demurrer to the evidence.

Defendant set up in its answer the right to publish such an article under constitutional guarantees of freedom of speech and of the press. It contends that the decision of the trial court, allowing damages therefor, was in violation of Sections 14 and 30 of Article II of the Constitution of Missouri and of the Fourteenth Amendment to the United States Constitution. Recent decisions of the United States Supreme Court have held that "the freedom of speech and of the press, which are secured by the First Amendment against abridgement by the United States, are among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgement by a State." [Thornhill v. State of Alabama, 310 U. S. 88; 60 Sup. Ct. 736, 84 L. Ed. 1093, and cases cited.] The Fourteenth Amendment applies to the common law policy as well as the statutory policy of a state. [American Federation of Labor v. Swing, 312 U. S. 321, 61 Sup. Ct. 568, 85 L. Ed. 513.] We also said in Diener v. Star-Chronicle Pub. Co., 230 Mo. 613, 132 S. W. 1143: "Freedom of speech is guaranteed to the individual and newspaper by the Constitution. Courts are charged with a duty they may not pretermit, to see to it that it is not abridged." Thus a case is presented "involving the construction of the Constitution of the United States" and "of this State" (Sec. 12, Art. 6, Constitution of Missouri) within the jurisdiction of this court. Likewise, it presents a constitutional question upon a set of facts which has not heretofore been decided in this State.

Defendant, in its weekly news magazine called "Time" published the following article on March 13, 1939:

"STARVING GLUTTON

"One night last week pretty Mrs. Dorothy Barber of Kansas City grabbed a candy bar, packed up some clothes, and walked to General Hospital. 'I want to stay here,' she said between bites. 'I want to eat all the time. I can finish a normal meal and be back in the kitchen in ten minutes eating again.'

"Dr. R. K. Simpson immediately packed her off to a ward, ordered a big meal from

(Published here was a picture of plaintiff by "International")

(Underneath picture was printed: "Insatiable-Eater Barber" and "She eats for ten.")

"the hospital kitchen while he questioned Mrs. Barber. He found that although she had eaten enough in the past year to feed a family of ten, she had lost 25 pounds. After a preliminary examination Dr. Simpson thought that Mrs. Barber's pancreas might be functioning abnormally, that it might be burning up too much sugar in her blood and somehow causing an excessive flow of digestive juices, which sharpened her appetite.

"While he made painstaking laboratory tests and discussed the advisability of a rare operation, Mrs. Barber lay in bed and ate."

The picture published with the article showed Mrs. Barber in bed in a long-sleeved hospital gown. It was a close-up picture showing only her face, head and arms, with the bedclothes over her chest. It was furnished to defendant by "International," a syndicate dealing in news pictures. The article follows mainly the wording of an account furnished by "United Press." This picture and article appeared on a page in defendant's magazine entitled "Medicine." Defendant's evidence showed that the purpose of this department was to give the public medical news and developments in terms which could be understood by and in a way which would be interesting to lay readers.

The right of privacy was recognized in Missouri in Munden v. Harris, 153 Mo. App. 652, 134 S. W. 1076; a case where plaintiff's picture was used in an advertisement without consent. Twelve states (also Alaska and the District of Columbia) have recognized such a right on common law principles; two states have established the right by statute; six states have expressly refused to accept it by judicial decision; and the remaining states have not decided the question. [The Right of Privacy—Nizer, 39 Mich. Law Rev. 526, 1. c. 529; see also 54 C. J. 816; 21 R. C. L. 1196.] It has been recognized and stated by the American Law Institute, as follows: "A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other." [4 Restatement of Torts, 398, sec. 867.]

The comment of the Institute, following this section, is in part as follows:

"The interest which one has to maintain his privacy and to live an individual life, which is the basis of the rule, is similar to the much more strongly protected interest to have one's person free from unwanted intentional physical contacts by others. In some aspects it is similar to the interest in reputation, which is the basis of an action for defamation, since both interests have relation to the opinions of third persons. . . .

"This rule stated in this Section is not dependent upon conduct which, aside from the invasion of privacy, would be tortious, such as trespass to land or chattels, or defamation. Neither does it depend for its validity upon a breach of confidence, nor upon the untruth of the statements. On the other hand, liability exists only if the defendant's conduct was such that he should have realized that it would be offensive to persons of ordinary sensibilities. It is only where the intrusion has gone beyond the limits of decency that liability accrues. These limits are exceeded where intimate details of the life of one who has never manifested a desire to have publicity are exposed to the public, or where photographs of a person in an embarrassing

pose are surreptitiously ▮▮▮ taken and published. · On the other hand, there is no invasion of a right of privacy in the description of the ordinary goings and comings of a person or of weddings, even though intended to be entirely private, or of other publications to which people do not ordinarily seriously object. In determining liability, the knowledge and motives of the defendant; the sex, station in life, previous habits of the plaintiff with reference to publicity, and other similar matters are considered. A distinction can be made in favor of news items and against advertising use. It is only when the defendant should know that the plaintiff would be justified in feeling seriously hurt by the conduct that a cause of action exists.''

It was pointed out in 1890 in the classic article by Samuel D. Warren and Louis D. Brandies (The Right to Privacy, 4 Harvard Law Rev. 193) that ''instantaneous photographs and newspaper enterprises have invaded the sacred .precincts of private .and domestic life;'' that ''numerous mechanical devices threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops' '' (with radio and television that is a considerable understatement) ; and that ''the unauthorized circulation of portraits of private persons, and the evil of invasion of privacy by the newspapers'' requires a remedy. The writers' conclusion was that the principles of the common law could provide a remedy and that it should be subject to the following limitations:

''1. The right of privacy does not prohibit any publication of matter which is of public or general interest. . . .

''2. The right to privacy does not prohibit the communication of any matter, though in its nature private, when the publication is made under circumstances which would render it a privileged communication according to the law of slander and libel. . . .

''3. The law would probably not grant any redress for the invasion of privacy by oral publication in the absence of special damage. . . .

''4. The right to privacy ceases upon the publication of the facts by the individual, or with his consent. . . .

''5. The truth of the matter published does not afford a defence.
. . . .

''6. The absence of 'malice' in the publisher does not afford a defence.''

The basis of the right of privacy is the right to be let alone. [Cooley on Torts (4 Ed.), 444, Sec. 135.] It has been suggested that what is actually involved is ''appropriation of an interest in personality.'' [The Right of Privacy—Green, 27 Ill. Law Rev. 237, l. c. 254; see also Interests in Personality—Pound, 28 Harvard Law Rev. 343.] The right to privacy (or personality) is a part of the right to liberty and pursuit of happiness, which recognizes that the individual does not exist solely for the State or society but has inalienable rights, which can not be lawfully taken from him, so long as he behaves properly. [See discussion in Pavesich v. New England Life Ins. Co.

1206

(Ga.), 50 S. W. 68, 69 L. R. A. 101, 2 Ann. Cas. 561.] In the Pavesich case, the court said: "The right of privacy within certain limits is a right derived from natural law, recognized by the principles of municipal law, and guaranteed to persons in this State by the Constitution of the United States and of the State of Georgia, in those provisions which declare that no person shall be deprived of liberty except by due process of law." California has also stated a constitutional basis for recognizing and protecting the right of privacy, in Melvin v. Reid (Cal.), 297 Pac. 91 (citing many cases). The decision was based on Section 1, Art. 1 of the California Constitution: "all men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property; and pursuing and obtaining safety and happiness." (Our Sections 1-4 of Art. 2 state the same principles.) Thus the right of privacy (as well as freedom of the press) is, or at least grows out of, a constitutional right.

Nevertheless, under our form of governments, citizens have duties and obligations to the community and society as well as rights. In order to preserve rights for himself one must aid in preserving them for all. This requires cooperation with others. No one is entitled to or can have complete isolation. Individual rights must be construed in the light of duties incumbent upon individuals as citizens of a free country. In Sidis v. F-R Publishing Corp. (U. S. C. C. A.), 113 Fed. (2d) 806, l. c. 809, the court said: "Everyone will agree that at some point the public interest in obtaining information becomes dominant over the individual's desire for privacy." Conduct, either good or bad, or even misfortune, may properly bring persons to public attention and then (as said in Restatement of Torts comment under Section 867): "They are subject to the privileges which publishers have to satisfy the curiosity of the public as to their leaders, heroes, villians and victims." Likewise, however, freedom of the press was not created merely for the benefit of the press, but because it is essential to the preservation of free government and progress of civilization. "In the ultimate, an informed and enlightened public opinion was the thing at stake," and "the predominant purpose of the grant of immunity . . . was to preserve an untrammeled press as a vital source of public information." [Grosjean v. American Press Co., 297 U. S. 233, 56 Sup. Ct. 444, 80 L. Ed. 660.] Therefore, the press, like individual citizens, must not abuse its constitutional rights or overlook its obligations to others.

 Thus, establishing conditions of liability for invasion of the right of privacy is a matter of harmonizing individual rights with community and social interests. We think they can be harmonized on a reasonable basis, recognizing the right of privacy without abridging freedom of the press. The determination of what is a matter of public concern is similar in principle to qualified privilege in libel. It is

for the court to say first whether the occasion or incident is one of proper public interest. (As it must say whether an occasion is one to which qualified privilege extends in libel.) [Warren v. Pulitzer Pub. Co., 336 Mo. 184, 78 S. W. (2d) 404.] If the court decides that the matter is outside the scope of proper public interest and that there is substantial evidence tending to show a serious, unreasonable, unwarranted and offensive interference with another's private affairs, then the case is one to be submitted to the jury. We think this is the rule to be deduced from the best considered authorities and hold that it is the rule to be followed in this State. We further hold that this rule (applied to the facts of this case) does not interfere with the freedom of the press or its effective exercise, but only limits its abuse; and does not violate any of the constitutional provisions upon which defendant relies.

Considering the article herein involved, we think plaintiff made a jury case. It was shown that plaintiff not only did not consent to the publication of any article or picture in connection with her illness, but protested against any publicity to the reporters, who interviewed her, and that her picture was taken by one while the other was trying to persuade her to consent to such publicity. Certainly if there is any right of privacy at all, it should include the right to obtain medical treatment at home or in a hospital for an individual personal condition (at least if it is not contagious or dangerous to others) without personal publicity. [See Simonsen v. Swenson (Neb.), 177 N. W. 831, 9 A. L. R. 1250, note 1254.] "To enable a physician to treat his patient to advantage it is often necessary that the patient communicate information which it would be both embarrassing and harmful to have circulated generally throughout the community." [21 R. C. L. 378, sec. 24.] The public generally understands that the ethics of the medical profession require such matters to be kept confidential. Our Legislature has furnished protection by statutes (Sec. 1895, R. S. 1939) which gives the patient a privilege to prevent its disclosure even in court without his consent or waiver. It was not necessary to state plaintiff's name in order to give medical information to the public as to the symptoms, nature, causes or results of her ailment. The representative of defendant's medical department testified she knew that "in medical books, case histories of people do not even mention the names or addresses but simply refer to them by letters or symbols;" that "so that as far as interest from a medical standpoint is concerned it wasn't necessary to have her picture or her name and address at all;" but that "an attractive picture . . . of a young lady . . . will attract reader's interest." The same thing was true of the title "Starving Glutton" which defendant originated. Certainly plaintiff's picture conveyed no medical information. While plaintiff's ailment may have been a matter of some public interest because unusual, certainly the identity of the person who suffered this ailment was not.

Whatever the limits of the right of privacy may be, it seems clear that it must include the right to have information given to or gained by a physician in the treatment of an individual's personal ailment kept from publication which would state his name in connection therewith without such person's consent. Likewise, whatever may be the right of the press, tabloids or news reel companies to take and use pictures of persons in public places, certainly any right of privacy ought to protect a person from publication of a picture taken without consent while ill or in bed for treatment and recuperation. We, therefore, hold that the court properly overruled defendant's demurrer to the evidence.

 Defendant also assigns error in giving plaintiff's instruction authorizing punitive damages. We think this must likewise be decided upon the analogy of qualified privilege. However, since the truth of the matter is not involved in a right of privacy action, it would seem that any action seeking damages for an untrue statement should be in libel. [See Themo v. New England Newspaper Pub. Co. (Mass.), 27 N. E. (2d) 753, 1. c. 754-55.] The same article might involve both libel and invasion of privacy, and action could be stated in separate counts. This was done in Sidis v. F-R Publishing Company, supra. Recovery for untrue statements should be on the libel count (both as to actual and punitive damages), while recovery for invasion of privacy by true statements should be limited to that count. In qualified privilege "the privilege is said to rebut the presumption of express malice implied in other cases from the defamatory subject matter" and plaintiff has the burden to prove express malice; namely, actual improper motive. [Warren v. Pulitzer Pub. Co., supra.] Therefore, in an invasion of privacy action, since truth or untruth is not an issue, to recover punitive damages the burden should be on plaintiff to prove express malice. In Munden v. Harris, supra, the court said "if the element of malice appears, as that term is known to the law, exemplary damages may be recovered." It did not explain the matter, but it was speaking about a case in which the defendant had used the plaintiff's picture without consent in an advertisement. Invasion of privacy for advertising purposes would be a better basis for an inference of improper motive than would publicity by means of news articles and would do doubt require less in supporting circumstances to prove express malice. Certainly the acts of the reporters shown in this case would be sufficient to prove express malice, against them and their employer, as a wanton intentional invasion of plaintiff's rights. (Coming back with a photographer after being refused her consent to publish an article about her ailment and taking her picture surreptitiously while she was voicing her protests against any publicity in a conversation with one of them, by means of which he attracted her attention away from the photographer.) However, it was not shown that these persons had any connection with de-

fendant or that defendant knew what they had done and no such contention is even made.

It does appear that defendant's employees first saw an article about plaintiff's ailment, with her picture, in the New York Daily News. They were also thereafter furnished an article about this by "United Press," the news service to which defendant subscribed. Before the article was published, the representative of defendant's medicine department wrote to their Kansas City representative (a reporter for a Kansas City newspaper) and received a report from him which verified the story. Defendant merely assumed consent of plaintiff because of the prior publication of the article and picture elsewhere. That is not enough to escape liability, but mere lack of further investigation under all the circumstances should not impose punitive damages in this case. It is not contended that defendant had any knowledge to the contrary. We, therefore, hold that there was not sufficient evidence to show express malice on the part of defendant and that it was error to give the instruction authorizing punitive damages.

It is therefore ordered that, if plaintiff will within ten days enter a *remittitur* of the $1500 awarded for exemplary or punitive damages, as of the date of judgment, then the judgment will be affirmed for $1500 actual damages as of its date. Otherwise, judgment will be reversed and the cause remanded. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.