BIEDERMAN'S OF SPRINGFIELD, INC.,
a corporation, Respondent,

v.

Don C. WRIGHT and Daisy Wright,
Appellants.

No. 46709.

Supreme Court of Missouri,

Division No. 2.

April 13, 1959.

James H. Keet, Springfield, for defendants-appellants.

Irving W. Schwab, Thomas D. Dwyer, Springfield, for respondent.

STORCKMAN, Presiding Judge.

Plaintiff sued the defendants, husband and wife, in the Magistrate Court of Greene County, alleging that the defendants had purchased merchandise from the plaintiff in the total amount of $686.83 and had paid $154, leaving a balance of $532.83, for which amount with interest judgment was prayed. The defendants' answer admitted the purchase of merchandise but alleged that $209 had been paid on the account. The defendants further admitted that the plaintiff demanded payment at numerous times and alleged their reasons for not paying the balance was because of the plaintiff's failure and refusal to give proper

credit for payments made. Defendants further aver they were without information or belief as to whether the price charged for the merchandise was reasonable and just and prayed a determination of the amount due.

The defendants also filed separate counterclaims, each seeking the recovery of damages in the sum of $15,000, consisting of actual damages $5,000, and punitive damages $10,000, because of allegedly tortious conduct of the plaintiff in attempting to collect the account. Because the amount of the counterclaims exceeded the jurisdiction of the Magistrate Court, the cause was transferred to the Circuit Court. There the plaintiff filed its motion to dismiss the separate amended counterclaims on the ground that such pleadings failed to state claims upon which relief could be granted. The motion was sustained and the counterclaims were dismissed. The defendants appealed from the judgment of dismissal.

The sole question presented on appeal is whether the counterclaims state claims upon which relief can be granted. Since the pleadings are hardly susceptible of condensation, we will set out in extenso the mooted allegations. The counterclaim of defendant, Daisy Wright, alleges in the first two paragraphs that the defendants are husband and wife, and that the plaintiff has failed to give the defendants full credit for the payments made on the merchandise purchased. The counterclaim then proceeds:

"3. On May 17, 18 and 20, 1957, Robert Mashburn, acting in the course and scope of his employment by plaintiff as an 'Outside Collector', went to Mary's Cafe in Springfield, Missouri, where this defendant was then working as a waitress, and on the three said dates accosted this defendant with loud, overbearing, tough, degrading and embarrassing demands that she pay the said account and tried to get her to sign a post-dated check for payment on the said account. On the occasion he came to the cafe on May 17, 1957, he used language which was very threatening, including the words 'Your day's arrived' and 'You will talk to me' (said quoted words meaning that this defendant's time had come and something bad was going to happen to her and if she did not do something about the account, Mashburn would, by some means, fair or foul, make this defendant talk to him). As the said Mashburn was thus threatening this defendant on May 17, he was following her around in the cafe as she did her waitress work.

"4. On May 18, 1957, Mashburn again at said cafe threatened this defendant with the threat that he would stay all day on May 20 and would garnishee and get both defendants fired from their jobs and he again followed her around the cafe while she was doing her waitress work and again tried to get her to sign a post-dated check for payment of the account.

"5. On May 20, 1957, Mashburn said to this defendant at the cafe 'Something is going to be done here while I am here—I think you're dead beats—I don't think you intended to pay for the furniture when you got it'.

"6. On each of said three dates when the said Mashburn came to the cafe as aforesaid, he talked in a loud, threatening, quarreling and abusive manner and so that the customers in the cafe at the time could hear and would hear what he was saying to this defendant. On each of the three occasions, numerous customers were in the said cafe and heard and saw what occurred between said Mashburn and this defendant. On each of the three occasions, the management of the said cafe repeatedly asked Mashburn to leave the premises and stop bothering this defendant but Mashburn persisted in his conduct and would not leave the premises, thus committing a trespass on the said property on each of said occasions. This defendant on each of the three occasions told Mashburn she could not talk to him about the account while she was working and assured him she would discuss it with him at her home and then entreated him to leave, but he refused to do so and

894

on each of the occasions remained for an unduly long time and continued to harass her.

"7. On each of the three occasions, numerous customers were in the said cafe and heard and saw what occurred between said Mashburn and defendant Daisy Wright. The following words thus spoken by the said Mashburn on May 20, 1957 ([sic] 'I think you're dead beats—I don't think you intended to pay for the furniture when you got it' were spoken of and concerning defendants and tended to and did subject defendants to the hatred, contempt and ridicule of the persons in the said cafe at the time the words were thus spoken within the hearing of such persons, and also to the hatred, contempt and ridicule of the entire community in which this defendant lives. The said words imputed, and the said persons in the cafe heard and understood that they imputed, that this defendant was dishonest and failed to keep her word and was guilty of a crime (obtaining property by false pretenses), which involved moral turpitude.

"8. Plaintiff, acting through its employee, Mashburn, should have realized, and did realize, that Mashburn's acts would be offensive to persons of ordinary sensibilities and to defendants, and that they dealt with details of defendants' private life which defendants did not want exposed to the public and would seriously object to publicizing unnecessarily. The said conduct was a serious, unreasonable, unwarranted, coercive and oppressive interference with defendants' private affairs. Defendant at no time consented to publication of the words thus spoken of them by Mashburn.

"9. The said acts of the said Mashburn put defendants into disgrace and ridicule in the eyes of the public; imputed dishonesty to them; had a natural tendency to degrade and disgrace them and render them odious, ridiculous and contemptible in the eyes of the public; imputed that defendants were unwilling to pay their just debts and failed

to keep their word; were intended to produce mental pain, shock and anguish in defendants.

"10. The said Mashburn was in a strategic and peculiar position to harass defendants. The said acts of the said Mashburn were done and committed intentionally, wilfully, wantonly and maliciously and for the purpose of, and with the effect of, harassing and annoying defendants mentally and producing severe mental pain, shock and anguish in defendants and gave the general public information on a private matter (the status of the debt owed to plaintiff by defendants) in which the general public had, and could have, no legitimate interest. The said acts were not justified as efforts to collect the debt from defendants. They were coercive, oppressive, threatening and challenging and loud and were committed over the protests of, and without the consent of this defendant. They tended to, and were calculated to, and did, create a breach of the peace and were so offensive and provoking that it was necessary to, and the manager did, usher Mashburn outside the cafe on the third said occasion, which happened on March 20, 1957, as aforesaid, and on said occasion the police were summoned to the cafe because of Mashburn's conduct on that day. The said conduct of Mashburn so upset this defendant that she became extremely nervous and shaky and was unable to do her waitress work properly, which detracted from the reputation as a good waitress which she had previously enjoyed, and prejudiced her in her occupation as a waitress. It also caused special damage to her reputation and conduct of her waitress work since it reflected on her integrity, and her calling as a waitress required integrity. On each of the three occasions, the said Mashburn did disturb the peace of this defendant.

"11. As a result of the said Mashburn's conduct on the three said occasions, this defendant's husband, defendant Don Wright, was required by his employer, the Rose Exterminator Company of Spring-

field, Missouri, to cease working in the Springfield, Missouri, area where he had previously worked for said company. The defendant Don Wright did quit working in the Springfield, Missouri, area for the said reason and has moved to Joplin, Missouri, and this defendant, Daisy Wright, has, because of this, had to move to Joplin, Missouri, with her husband, and leave her waitress work at Mary's Cafe.

"12. This defendant has, by said acts of said Mashburn been greatly injured in her good name, fame and reputation and brought into public reproach, disgrace, contempt, ridicule and hatred and caused to suffer great mortification, humiliation, embarrassment and shame, and caused to suffer lasting and permanent mental shock, injury, embarrassment and derangement and her right to be let alone and not have intimate details of her life exposed to the public have been violated."

The counterclaim of defendant Don C. Wright adopts by reference the allegations contained in paragraphs 1 to 12, inclusive, of Mrs. Wright's counterclaim and makes these additional allegations:

"2. This defendant has, by the said acts of said Mashburn, been greatly injured in his good name, fame and reputation and brought into public reproach, disgrace, contempt, ridicule and hatred and caused to suffer great mortification, humiliation, embarrassment and shame, and caused to suffer lasting and permanent mental shock, injury, embarrassment and derangement and his right to be let alone and not have intimate details of his life exposed to the public have been violated.

"3. At all times mentioned herein this defendant has been and now is employed by the Rose Exterminator Company of Springfield, Missouri, as a salesman and workman with the duty of collecting money from customers and keeping accounts on same. As a direct and proximate result of the said Mashburn's conduct as aforesaid, the Rose Exterminator Company transfer-

red this defendant out of the Springfield, Missouri, area where he had been working prior to the said Mashburn's said misconduct and it was necessary for this defendant to move his home away from Springfield, Missouri, to Joplin, Missouri, which caused him financial loss.

"4. The following words thus spoken on May 20, 1957, of and concerning this defendant, to-wit, 'Something is going to be done here with (sic) I am here—I think you're dead beats—I don't think you intended to pay for the furniture when you got it', imputed that this defendant was dishonest and failed to keep his word and was guilty of crime (obtaining property by false pretenses), which involved moral turpitude. This in turn reflected on this defendant's credit and integrity as a salesman for the Rose Exterminator Company and by reason of the speaking of the said words, this defendant was injured in his good name and reputation as a salesman."

■ An individual's right of privacy is legally protected and the violation of such right has been recognized as an independent tort by the courts of Missouri. Barber v. Time, Inc., 348 Mo. 1199, 159 S.W. 2d 291; Munden v. Harris, 153 Mo.App. 652, 134 S.W. 1076; State ex rel. Clemens v. Witthaus, 360 Mo. 274, 228 S.W.2d 4, 10[13].

While much has been written on the subject, precise limits to the right of privacy are difficult to determine. In 41 Am.Jur. 925, Privacy, § 2, we find this definition: "The right of privacy is concisely defined as the right to be let alone. It has also been defined as the right of a person to be free from unwarranted publicity, and as the right to live without unwarranted interference by the public in matters with which the public is not necessarily concerned." Of similar import are the definitions and statements in 77 C.J.S. Right of Privacy § 1a, pp. 396–397, and Restatement of the Law of Torts, § 867, p. 398. The nature of the right of privacy is further explained in the Comment of the Restatement, § 867,

p. 398, as follows: "The interest which one has to maintain his privacy and to live an individual life, which is the basis of the rule, is similar to the much more strongly protected interest to have one's person free from unwanted intentional physical contacts by others. In some aspects it is similar to the interest in reputation, which is the basis of an action for defamation, since both interests have relation to the opinions of third persons." Under Conditions of liability is this further statement, § 867, pp. 400–401: "The rule stated in this Section is not dependent upon conduct which, aside from the invasion of privacy, would be tortious, such as trespass to land or chattels, or defamation. Neither does it depend for its validity upon a breach of confidence, nor upon the untruth of the statements. On the other hand, liability exists only if the defendant's conduct was such that he should have realized that it would be offensive to persons of ordinary sensibilities. It is only where the intrusion has gone beyond the limits of decency that liability accrues. These limits are exceeded where intimate details of the life of one who has never manifested a desire to have publicity are exposed to the public, or where photographs of a person in an embarrassing pose are surreptitiously taken and published."

Liability for invasion of the right of privacy has been invoked with respect to unreasonable and oppressive methods employed to enforce collection of debts. In 41 Am.Jur. 947, Privacy, § 30, it is stated that: "Recovery has been permitted in several cases on account of oppressive treatment of a debtor by a creditor in attempting to collect debts. The giving of undue publicity to private debts has been held to constitute an invasion of the debtor's right of privacy."

Cases dealing with violation of the right of privacy, as well as other remedies for unreasonable and oppressive methods of debt collection, are the subject of an annotation in 55 A.L.R. 971, entitled "Right of action for damages because of methods used in attempting to collect debt," wherein it is stated: "Since, as will appear, the methods employed in attempting to collect debts vary to a great extent, both in their nature and in their effect upon the debtor, it is difficult to formulate a general rule to cover the precise question. Each case must necessarily stand on its merits. It has been quite generally held, however, that a method used in attempting to obtain payment of a debt, which tends to impute dishonesty to the debtor, or to throw him into disgrace and ridicule, or to invade his right of privacy, gives a right of action for damages to the debtor against the person employing such a method." See also the annotations in 106 A.L.R. 1453, 138 A.L.R. 91, 168 A.L.R. 462, 14 A.L.R.2d 770, § 19, and 15 A.L.R.2d 108, 158, §§ 28–31, which consider most of the cases dealing with this subject decided prior to the date of the latest annotation. The annotation in 15 A.L.R.2d at page 160, § 30, states: "While recognizing the right of a creditor to solicit payment of the amount due him, the courts have found liability if abusive language is used or if the solicitation has been made under such outrageous circumstances as to indicate a wilful disregard for the proprieties."

The Missouri cases of Barber and Munden, supra, were not debt collection cases; they involved the publication of pictures and printed matter which are the classic examples of the legally enforceable right of privacy. Likewise, most of the cases applying the doctrine to methods of debt collection have been concerned with the use of obnoxious letters, placards, advertisements, and other printed material calculated to coerce payment without resort to legal remedies.

The historic treatise on "The Right To Privacy" by Samuel D. Warren and Louis D. Brandeis, published in 1890, 4 Harvard Law Review 193, 217, suggests this limitation, among others, on the right: "3. The law would probably not grant any redress for the invasion of privacy by oral publication in the absence of special damage.

"The same reasons exist for distinguishing between oral and written publications of private matters, as is afforded in the law of defamation by the restricted liability for slander as compared with the liability for libel. The injury resulting from such oral communications would ordinarily be so trifling that the law might well, in the interest of free speech, disregard it altogether." The language used indicates that from the beginning the rule of limitation was not a dogmatic pronouncement and that it had its own qualifications.

Regardless of the force and effect of this limitation as originally proposed in 1890 or its present soundness, there can be no justification for applying it in circumstances where the reasons advanced in support of it would not be violated. Assuming the facts alleged to be true, as we must on this review, we find the words spoken to be so offensive and oppressive and the time and place of their speaking so exposed to public sight and hearing that we cannot say that the injury resulting to the defendants was "so trifling that the law might well, in the interest of free speech, disregard it altogether." The oral publication of a private matter with which the public has no proper concern may be just as devastating and damaging as a written communication. We see no logical distinction between the plaintiff's writing letters to the defendants and each of those present in the cafe stating, among the other things alleged, that the defendants had refused to pay their bill; that they were dead beats and did not intend to pay for the furniture when they got it; and that he intended to get both of them fired from their jobs; and the plaintiff's agent going to the cafe on three separate occasions and declaiming the same things in a loud and threatening manner thereby tending to degrade and humiliate the defendants in public. In the circumstances alleged, the oral publication would seem to be more productive of emotional distress and widespread and lasting damage than a written communication. The circumstances of this case are so aggravated

that we decline to hold the counterclaims insufficient because the communications were oral.

The most recent case applying the remedy of invasion of the right of privacy by an oral publication in connection with the attempt to collect a debt is Housh v. Peth, 1956, 165 Ohio St. 35, 133 N.E.2d 340. In that case the defendant initiated a campaign to harass and torment the debtor, telephoning her six or eight times at her home and place of employment, calling her from the classroom where she was teaching three times within a period of fifteen minutes, and telephoning her superiors with the resultant threat of loss of employment. These calls extended over a period of three weeks and some were made as late as 11:45 p. m. This course of conduct was held to be unreasonable and a wrongful invasion of the plaintiff's right of privacy and a recovery of damages was affirmed by the Supreme Court of Ohio. In Bowden v. Spiegel, Inc., 1950, 96 Cal.App.2d 793, 216 P. 2d 571, plaintiff's petition alleged that the defendant's agent telephoned the plaintiff at a neighbor's house late at night and told her that unless she came to the defendant's store the next morning to pay her bill he would cause her a lot of trouble; that the entire neighbor's family heard the plaintiff's end of the telephone conversation; that the plaintiff did not owe the defendant any money; and that the agent acted maliciously and with intent to vex and annoy the plaintiff, as a result of which she became ill. The opinion states that the important element of the offense was that the act was intentional and unreasonable and likely to result in illness and holds that the petition states a cause of action on that theory. We consider the circumstances of the present case to be more aggravated than those of the Housh and Bowden cases.

In support of its contention that oral communications will not support an action for the invasion of the right of privacy, the respondent, in addition to authorities we have mentioned, cites the following:

**898**

Cason v. Baskin, 155 Fla. 198, 20 So.2d 243, 168 A.L.R. 430, in which the statement is made that the right of privacy is not violated by an oral communication; however, this was said in the course of a comprehensive review of the origin and development of the right and must be taken as obiter dictum because the court held the plaintiff stated a cause of action for violation of her right of privacy by reason of the defendant's writing and publishing a book concerning her; Melvin v. Reid, 112 Cal.App. 285, 297 P. 91, involved the making of a motion picture based on plaintiff's life and use of her maiden name in the picture; Gregory v. Bryan-Hunt Co., 295 Ky. 345, 174 S.W.2d 510, involved an oral charge of theft of cigarettes, and it was held that the action must be for slander because an action for violation of the right of privacy cannot be used as a substitute for other established actions; and Prosser on Torts, Second Edition, § 97, p. 641, which states: "Except in the cases of physical intrusion, it has been held that the tort must be founded upon publicity, in the sense of communication to the public in general or to a large number of persons, as distinguished from one individual or a few." We believe that the oral publication over the three-day period in a public restaurant with numerous customers present satisfies any reasonable requirement as to publicity.

In view of our other conclusions it will not be necessary to consider the appellants' contentions that the conduct of the respondent's agent constituted trespass, peace disturbance, slander, and intentional causing of severe mental suffering. It may be noted, however, without deciding, that the present-day tendency seems to be to permit recovery for severe emotional distress where it has been intentionally caused. Restatement of the Law of Torts, 1958 Supplement, § 46, p. 612; Barnett v. Collection Service Co., 214 Iowa 1303, 242 N.W. 25. In this regard note also Gambill v. White, Mo., 303 S.W.2d 41, 43[1], and Crenshaw

v. O'Connell, 235 Mo.App. 1085, 150 S.W.2d 489, 493[11, 12].

■ Our conclusion is that the counterclaims each state a claim for invasion of the defendants' rights of privacy and in this situation pleading the falsity of the charges and special damages, as well as other elements of slander, are rendered unnecessary.

The judgment is reversed and the cause remanded.

All concur.