Robert A. **MIKEL**, Plaintiff,

v.

Bernard **ABRAMS**, M.D., Defendant.

No. 81–0009–CV–W–1.

United States District Court,
W. D. Missouri, W. D.

June 18, 1982.

Jeffrey D. Zimmerman, Kansas City, Mo., Edward W. Dosh, Parsons, Kan., for plaintiff.

John W. Cowden, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDERS GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY

JOHN W. OLIVER, Senior District Judge.

### I.

This diversity of citizenship case pends on defendant Bernard Abrams' motion for partial summary judgment on the issue of liability filed pursuant to this Court's February 22, 1982 Memorandum and Order Directing Further Proceedings. In that Memorandum and Order, we separated the issue of liability pursuant to Rule 42(b), Fed.R. Civ.P. to be presented for the Court's determination upon defendant Abrams' motion for partial summary judgment under Rule 56, Fed.R.Civ.P.

Therein, the Court also approved the parties' agreement that that motion should be determined solely on the pleadings, depositions, answers to interrogatories, and admissions on file, together with any other factual data then contained in the files and records of the case. On March 4, 1982, that Order was amended to include transcripts from the divorce and custody proceedings between plaintiff Robert Andrew Mikel and Charlene Ann Mikel in the District Court of Labette County, Kansas.

Pursuant to that Order, the parties each have submitted proposed findings of fact and conclusions of law in separately numbered paragraphs with appropriate citations to the record. Each party has indicated its admission in whole or in part, or its denial of each of its opponent's proposed factual findings; wherefore, the following findings of fact, proposed by defendant Bernard Abrams and admitted to be true by plaintiff, are made by the Court:

1. Plaintiff Robert A. Mikel is an individual who is a citizen of the State of Kansas.

2. Defendant Bernard M. Abrams, M.D., is a medical doctor who is a citizen of the State of Missouri.

3. Plaintiff claims damages in excess of $10,000.00.

4. Dr. Abrams is a specialist in the field of neurology in Kansas City, Missouri and has been affiliated with the staff of Menorah Medical Center [hereinafter "Menorah"] since 1969.

5. Plaintiff is employed as Chief of Social Services for the Parsons, Kansas office of the State Department of Social and Rehabilitation Services. He has been employed with that department since 1965.

6. Plaintiff has a master's degree in social work and has completed one-half the required hours toward an E.D.S. in counseling.

7. In April, 1979 plaintiff's family physician, Dr. Jothi, referred plaintiff to Dr. Abrams for examination and testing.

8. Plaintiff was admitted as a patient at Menorah on April 17, 1979.

9. During the initial physical examination, plaintiff told Dr. Abrams that his chief complaint was numbness of his face and spasms of certain muscles.

10. Dr. Abrams saw plaintiff at Menorah on April 18, 19, 20 and 21, 1979.

11. On April 21, 1979, Dr. Abrams discussed plaintiff's medical condition with plaintiff.

12. Dr. Abrams' final diagnosis of plaintiff's condition was "muscle fasciculations

and fatigue, probably secondary to chronic use of excessive nicotine, caffeine, and alcohol, and the patient may have myositis on that basis."

13. Plaintiff was married to Charlene Mikel from October 22, 1960 to July 25, 1979.

14. At the time plaintiff was admitted to Menorah on April 17, 1979 he was living with his then wife, Charlene Mikel.

15. On April 17, 1979 Charlene Mikel drove her husband, plaintiff Robert Mikel, from their home in Parsons, Kansas to Kansas City, Missouri, so that plaintiff could be admitted at Menorah.

16. Charlene Mikel accompanied plaintiff to Menorah for his admission on April 17, 1979.

17. Charlene Mikel was supposed to attend a staffing meeting with Dr. Abrams and plaintiff. However, she was unable to attend that meeting. Charlene Mikel would have had plaintiff's full consent to be present at such a meeting because at that time they were married and his medical condition was a matter of family concern.

18. Charlene Mikel attempted to contact Dr. Abrams to discuss plaintiff's condition during the following week when she was in Kansas City but she was unable to reach him on three different occasions.

19. On April 30, 1979 Charlene Mikel finally reached Dr. Abrams by telephone.

20. On August 11, 1979 Charlene Mikel forwarded a letter to Dr. Abrams. That letter reads as follows:

This letter is in regards to my telephone conversation with you on April 30, 1979 regarding the hospitalization of my husband (4–17 to 4–21).

When I asked about your medical findings you told me he was a—tense, tense young man—a typical Triple A personality and that there was no organic reasons for his symptoms. The only way he has been able to cope was through the use of Alcohol, Nicotine, and Caffeine.

When I asked if any psychological testing had been done you told me that you had not administered the MMPI. I then asked if you felt psychological counseling was needed and you said you felt it was indicated.

The suggestions you gave me—in order to get counseling for him were (1) Threaten to leave him—at which point I told you he was on his way to file for divorce (2) Stand firm—and see that he gets it. This I attempted to do—through the Crawford Co. Mental Health Center. We had one appointment at which time Bob stated that he felt he didn't have any problems and didn't need any help. He also does not believe that I talked with you or that you told me what you did. Therefore, would you please confirm what was discussed in the phone conversation. I feel that then he might go ahead and get the help he needs. He is continuing to drink. This also has to do with the custody of our 10 year old son as he feels that he can keep his dad from drinking.

21. On August 16, 1979 Dr. Abrams wrote a letter to Charlene Mikel in response to Charlene Mikel's letter of August 11, 1979. That letter reads as follows:

This letter is in response to your kind inquiry of August 11, 1979. I would like to reiterate that I did tell you that Mr. Mikel was very tense and that he was over-using alcohol, nicotine, and caffeine. I did suggest counseling for him in order to try to improve the problem of taking these substances in excess, and I did urge you to be firm, and especially in the case of alcohol addiction if it was a problem, to take the only tact that is commonly recommended which is to threaten to leave the individual. I want to stress to you that in no way do I wish to take sides in any family conflict, and that I am only reiterating what I feel is standard medical advise.

I wish the best for both you and your husband and your family, and hope that all your difficulties are speedily resolved. With best wishes, I remain

22. Dr. Abrams did not release any medical records pertaining to plaintiff to Charlene Mikel.

23. On May 3, 1979 plaintiff filed a divorce petition in the District Court of Labette County, Kansas, alleging among other things that he was a fit and proper person to have the care, custody and control of his minor son, Mark.

24. Charlene Mikel's answer to plaintiff's divorce petition alleged that plaintiff was unfit to have the care, custody, and control of his children, including his son Mark.

25. Plaintiff knew that as a part of the divorce hearing testimony would be given as to who was most fit to have custody of the child.

26. Plaintiff knew from his own experience as a social worker that his physical health and any bad habits, including a claim of drinking, would be an issue in the divorce action.

27. During the divorce hearing in the District Court of Labette County, Kansas on July 25, 1979, plaintiff testified that he had been a patient at Menorah under the care of Dr. Abrams. He further testified that Dr. Abrams told him that his nervous system was overtaxed by three depressants —coffee, tobacco, and alcohol.

28. Plaintiff testified during the divorce proceedings that he and his wife tried counseling, that it had not worked, and that he had agreed to counseling again with regard to the custody of his son.

29. In connection with the first divorce hearing held July 25, 1979 plaintiff or his attorney forwarded to the office of Dr. Abrams a written "Authorization To Furnish Medical Information and Release From Liability" requesting that Dr. Abrams furnish to plaintiff's attorney a medical diagnosis and recommendations for treatment based on the tests performed at Menorah.

30. The written authorization and release was handled by clerical personnel in Dr. Abrams' office and a copy of a clinical resume was forwarded to plaintiff's attorney, Edward W. Dosh.

31. During the divorce hearing held on July 25, 1979 plaintiff's attorney stated to the court that he and plaintiff had attempted to obtain a medical report pertaining to plaintiff's hospitalization at Menorah and that the report was supposed to be on the way.

32. Plaintiff obtained a copy of the clinical resume furnished by Dr. Abrams' office in response to plaintiff's written authorization and release. That clinical resume states:

HISTORY: This 43-year-old white male was admitted for a three to four year history of generalized muscle fasciculations and soreness in his muscles and also a one and one-half year history of numbness of the left lower face associated with tight sensations in the face, scalp, and neck, and also hot burning sensations around the eye.

PAST MEDICAL HISTORY: Significant in that patient had had a history of chewing one can of SKOAL per day and also drinking between 20 to 25 cups of coffee per day; Also, patient has episodic use of alcohol, which at some times can be quite extensive.

PHYSICAL EXAM: Essentially within normal limits.

NEUROLOGICAL EXAM: Revealed no abnormalities. No fasciculations were noted.

LABORATORY: Admission CBC was within normal limits. Admission SMA–12 was within normal limits, except for a sugar of 175, but this was a postprandial specimen. The sed. rate was measured at 2. Initial urinalysis revealed 2 to 4 RBC's. A repeat urinalysis on two separate occasions showed no RBC's. The antinuclear antibody was less than 1:20. Thyroid function studies were within normal limits. A CPK was within normal limits. A fasting blood sugar was measured at 88. An RPR was nonreactive. A chest X-ray and EKG were not done because they were done on admission in March of 1979 in Parsons, Kansas, and were within normal limits at that time.

HOSPITAL COURSE: The patient was admitted for a diagnostic evaluation of the above symptoms. During his hospital course, he had an electroencephalogram

which was within normal limits, ENG which showed no abnormalities. A BER was within normal limits. A visual evoked response showed delay of conduction through the anterior optic pathways bilaterally but was more marked on the left. It is significant to note that patient has bilateral vitreous degeneration for the last five years and has been followed by an ophthalmologist for this, and may have interfered in some way with this test. A CAT scan of the head was obtained and was within normal limits. A spinal fluid was done. The opening pressure was 150 mm. of water; 14 cc. of clear, colorless fluid was obtained. The protein on that specimen was 45 mg. per deciliter and the sugar was 60 mg. per deciliter. The cell count was one lymph, no polys, no mononuclear cells, no RBC's. The cultures, protein electrophoresis, and RPR are to follow on that specimen, and are pending at this time.

The patient had frequent headaches during his hospital admission which were thought to be secondary to withdrawal from coffee and were relieved by Tylenol. The final ASSESSMENT revealed muscle fasciculations and fatigue, probably secondary to chronic use of excessive nicotine, caffeine, and alcohol, and the patient may have a myopsis on that basis. At the time of discharge, spinal fluid protein electrophoresis was pending.

PLAN: The patient was discharged to return to see Dr. Abrams in two months at the office. During that time he advised to gradually discontinue the use of coffee, discontinue the use of SKOAL and to stop drinking. At this time of discharge, he was placed on Thiamine, 500 mg. a day and Theragran-M, one tablet three times a day. The patient was very accepting of this diagnosis and will return for followup.

FINAL DIAGNOSIS: Muscle Fatigue. Secondary to caffeine, nicotine, and alcohol abuse.[1]

1. The "final diagnosis" was written in longhand and is taken from Dr. Abrams' Deposition Exhibit # 2.

Dictated by Mary Coltharp, M.D.
For Bernard M. Abrams, M.D./jao

33. After plaintiff received the clinical resume that he had requested from Dr. Abrams' office, he showed it to his wife, Charlene Mikel.

34. On September 17, 1979 Charlene Mikel filed a motion in the District Court of Labette County, Kansas to reconsider the custody of her son, Mark. Attached to the motion was a copy of Dr. Abrams' letter of August 16, 1979.

We also make the following findings of fact, all of which were proposed by plaintiff and all of which have been admitted by defendant:

35. In the phone conversation which took place on April 30, 1979 between Charlene Mikel and Dr. Abrams, Charlene Mikel informed Dr. Abrams that Robert Mikel was on his way to file for divorce.

36. Sometime between July 16, 1979 and July 24, 1979 an "Authorization To Furnish Medical Information And Release From Liability" (hereinafter "authorization"), was received in Dr. Abrams' office.

37. An employee of Dr. Abrams responded to the request contained in the authorization.

38. The authorization specifically mentioned a divorce hearing and stated that it would take place on July 23, 1979.

39. The authorization was retained in the file which Dr. Abrams kept on Robert Mikel.

40. The return address for Charlene Mikel which was contained in her letter of August 11, 1979 to Dr. Abrams was not the same address which was listed for Robert Mikel in the authorization or the Menorah Medical Center admission face sheet.

41. Dr. Abrams never discussed Robert Mikel's condition with Charlene Mikel while Robert Mikel was hospitalized at Menorah Medical Center.

42. No medical records from Menorah Medical Center or Dr. Abrams nor any testimony of Dr. Abrams was admitted at the original divorce proceeding involving Robert Mikel and Charlene Mikel.

43. Plaintiff's attorney objected to testimony of Charlene Mikel regarding references to treatment by Dr. Abrams at the July 25, 1979 divorce proceeding and the objection was sustained.

44. Plaintiff's attorney objected to testimony of plaintiff's treatment by Dr. Abrams at the December 20, 1979 child custody hearing and the objection was sustained.

45. Charlene Mikel initiated the December 20, 1979 child custody proceeding.

46. Dr. Abrams' letter of August 16, 1979 was attached to a motion for change of custody filed by Charlene Mikel.

47. No claim regarding Robert Mikel's drinking was made until the subsequent child custody proceedings.

48. Betty Bartholomew advised Charlene Mikel to [arrange] for an alcohol confrontation committee to confront Robert Mikel with his alleged drinking problem.

## II.

The parties are agreed that plaintiff alleges two causes of action based upon the following:

1. The alleged unauthorized release of information contained in the letter dated August 16, 1979 from Bernard M. Abrams, M.D., without the consent of plaintiff Robert A. Mikel in breach of a confidential or privileged relationship.

2. The alleged invasion of plaintiff Robert A. Mikel's privacy by release of information contained in the letter dated August 16, 1979 without the consent of the plaintiff Robert A. Mikel.

The parties are also agreed that, as jurisdiction in this Court is predicated upon diversity of citizenship, the substantive law of Missouri applies to the factual circumstances presented. *Erie R. & R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Kennedy v. Dixon*, 439 S.W.2d 173 (Mo.banc 1969). Counsel further agreed and the Court, pursuant to that agreement, has dismissed with prejudice all claims by Mark Allen Mikel as plaintiff, and all claims against Menorah Medical Center as defendant. Consequently, only the stipulated two claims of Robert A. Mikel against defendant Dr. Bernard Abrams pend for determination on defendant's motion for partial summary judgment.

To simplify determination of the questions presented under applicable Missouri law, we shall first consider plaintiff's second invasion of privacy claim and then discuss plaintiff's claim based on defendant's alleged breach of a confidential or privileged relationship.

## III.

### A. *Invasion of Privacy*

Plaintiff claims that his privacy was invaded by the release, without his consent, of information contained in a letter dated August 16, 1979 from Dr. Abrams to Charlene Mikel. We disagree.

Missouri first recognized a cause of action for invasion of privacy in *Munden v. Harris*, 153 Mo.App. 652, 134 S.W.2d 1076 (Mo.Ct.App.1911). In *Munden*, plaintiff alleged that defendants had published and circulated his picture, without obtaining his consent, for advertising their business of selling merchandise. *Munden* recognized that the right of privacy is not unlimited and may be vitiated by consent or limited by "social conditions" such as business relations. 134 S.W.2d at 1079.

*Barber v. Time, Inc.*, 348 Mo. 1199, 159 S.W.2d 291 (1942), also involved the unauthorized publication of plaintiff's picture. The court stated that "establishing conditions for invasion of the right of privacy is a matter of harmonizing individual rights with community and social interests." 159 S.W.2d at 295. In *Barber*, "plaintiff not only did not consent to the publication of any article in connection with her illness, but protested against any publicity to the reporters who interviewed her, and ... her

picture was taken by one while the other was trying to persuade her to consent to such publicity." 159 S.W.2d at 295. In conclusion, the *Barber* court stated that:

Whatever the limits of the right of privacy may be, it seems clear that it must include the right to have information given to or gained by a physician in the treatment of an individual's personal ailment kept from publication which would state his name in connection therewith without such person's consent. [159 S.W.2d at 291]

The element of publicity inherent in *Munden* and *Barber* was made explicit in *Biederman's of Springfield, Inc. v. Wright*, 322 S.W.2d 892 (Mo.1959), a case involving oppressive collection techniques. There, the court cited Prosser on *Torts*, Second Edition, § 97, p. 641, which states "Except in the cases of physical intrusion, it has been held that the tort must be founded upon publicity, in the sense of communication to the public in general or to a large number of persons, as distinguished from one individual or a few." 322 S.W.2d at 898. *Biederman's* was followed by the Supreme Court of Missouri en banc in *Zimmerman v. Associates Discount Corp.*, 444 S.W.2d 396 (Mo.banc 1969), another debt collection case, in which it was held that threatening telephone calls to plaintiff from defendant's employees did not satisfy the "publicity" requirement. *Biederman's* was most recently followed in *Corcoran v. Southwestern Bell Tel. Co.*, 572 S.W.2d 212 (Mo.Ct. App.1978). *Corcoran* recognized that a defendant must intend or permit a reasonably broad publication before it can be held liable.

The applicable Missouri cases thus establish that a cause of action for "unreasonable publicity [given] to the other's private life," *Corcoran, supra*, at 214, (citing *The Restatement (Second) of Torts*, § 65A A.L.I. (1977)), requires that publicity must have been made by the defendant to a substantial number of persons who may reasonably be characterized as the "public," before a defendant may be held liable under applicable Missouri law.

The Eighth Circuit has recently examined the applicable Missouri law in regard to the question presented in *Tureen v. Equifax*, 571 F.2d 411 (8th Cir. 1978). In reversing a district court's failure to grant a defendant's motion for directed verdict at the close of all the evidence, the *Tureen* court held:

Our examination of Missouri law, which is in accordance with the view set forth in the *Restatement (Second) of Torts*, thus leads to the conclusion that there must be evidence of publicity in the sense of a disclosure to the general public or likely to reach the general public, as opposed to "publication" required in a defamation action, in order for plaintiff to make a submissible case of invasion of privacy by public disclosure of private facts. See *Restatement (Second) of Torts*, § 652D, at 383 (1977); W. Prosser, *Handbook of the Law of Torts* § 117 (4th ed. 1971); *Barber v. Time, Inc., supra*, 159 S.W.2d at 293, 295; *Biederman's of Springfield, Inc. v. Wright, supra*, 322 S.W.2d at 898. [*Id.* at 419]

In the case at bar, Dr. Abrams' August 16, 1979 letter was sent by him only to Charlene Mikel. That singular disclosure is insufficient as a matter of Missouri law to satisfy the publicity requirement of an invasion of privacy case involving alleged public disclosure of private facts. Plaintiff's contention that "Dr. Abrams ... knew or should have known that Charlene Mikel was Robert Mikel's antagonist in litigation and, therefore, any communication which he had with Charlene Mikel was *likely to be disseminated* and published to other third parties," is untenable. A similar contention was expressly rejected by the Eighth Circuit case in *Tureen*. This Court is under duty to follow and apply the rationale of that case.

Nor can it be said under the undisputed facts of this case, that the disclosure of the matters contained in Dr. Abrams' August 16, 1979 letter to Charlene Mikel was an *unreasonable* disclosure of plaintiff's private affairs to persons who had no legitimate interest in the subject matter of that

letter. We are satisfied that Missouri courts would follow and apply the principles stated in two cases from other jurisdictions which have ruled the narrow question presented. We believe that Missouri would follow *Tooley v. Provident Life and Accident Ins. Co.*, 154 So.2d 617 (La.Ct.App. 1963). In that case plaintiff alleged that "defendants violated her right of privacy, and knowingly aided and abetted her husband to obtain a divorce against her by disclosing her record at Mercy Hospital, notwithstanding such record represented confidential communications between physician and patient, and hospital and patient." 154 So.2d at 618.

The medical record involved in *Tooley* had initially been furnished by Mercy Hospital during the marriage, at the request of the husband, while the spouses were voluntarily living apart. Later, it was produced under a subpoena duces tecum. The court found that no cause of action had been stated because "the husband, during the marriage has a right to a full report from his wife's doctor. He is head and master of the community and responsible for its debts." 154 So.2d at 618.

*Curry v. Corn*, 52 Misc.2d 1035, 277 N.Y. S.2d 470 (1966), cited and followed *Tooley*. We believe Missouri would do likewise. In that case plaintiff alleged that her physician had revealed to her husband information obtained in the course of her treatment, in violation of the statutory doctor-patient privilege, and with the "intent and expectation" that her husband would use it in an affidavit in a pending matrimonial action. 277 N.Y.S.2d at 470. The *Curry* court concluded that "a physician who reveals the nature of the condition of the patient to a patient's husband may hardly be charged with reprehensible conduct." *Id.* at 471–72.

Dr. Abrams' letter of August 16, 1979 to Charlene Mikel merely confirmed the earlier April 30, 1979 telephone conversation between Dr. Abrams and Charlene Mikel, at which time Charlene Mikel was still plaintiff's wife. Dr. Abrams was entitled at that time to discuss plaintiff's condition and treatment with Charlene Mikel. Reiteration of the April 30, 1979 telephone conversation at a later date can not be characterized as an invasion of privacy or breach of a confidential relationship under applicable Missouri law.

In light of the conclusions above stated, it is unnecessary to consider defendant's arguments as to waiver or whether the matters contained in Dr. Abrams' August 16, 1979 letter could be considered humiliating to a person of ordinary sensibilities. *See Langworthy v. Pulitzer Publishing Co.*, 368 S.W.2d 385, 390 (Mo.banc 1963). We also need not and therefore do not reach the question of whether Dr. Abrams' letter of August 16, 1979 may have been conditionally privileged.

### B. *Breach of Confidential or Privileged Relationship*

Plaintiff alleges that Dr. Abrams' August 16, 1979 letter to Charlene Mikel constituted "breach of a confidential or privileged relationship." Plaintiff's basic argument is that defendant was under duty not to cooperate with his (patient's) adversary in litigation." Plaintiff suggests that several states have recognized a cause of action for the breach of duties that may be inherent in the doctor/patient relationship. *See, e.g., Horne v. Patton*, 291 Ala. 701, 287 So.2d 824 (1973). However, defendant correctly points out that no Missouri case has recognized such a cause of action. Although the relationship of doctor and patient was discussed in *Barber v. Time, Inc.*, 159 S.W.2d 291 (Mo.1942), there was no intimation in that case that Missouri courts would recognize a cause of action based solely on breach of a doctor and patient relationship.

In any event, under the undisputed facts of this case, defendant clearly did not seek to aid his patient's adversary in litigation. Dr. Abrams' August 16, 1979 letter expressly stated that he did not intend "to take sides in a family conflict," and that his letter did no more than reiterate what he had stated earlier.

Plaintiff cites of *Hammonds v. Aetna Casualty & Surety Co.*, 243 F.Supp. 793 (N.D.Ohio 1965) (Ohio Law) and *Alexander*

*v. Knight*, 197 Pa.Super. 79, 177 A.2d 142 (1962). Those cases are inapposite. Moreover, similar allegations of breach of loyalty were made in both *Tooley* and *Curry*. In *Tooley*, plaintiff alleged that defendants had "knowingly aided and abetted her husband to obtain a divorce against her by disclosing her record at Mercy Hospital, notwithstanding such record represented confidential communications between physician and patient, and hospital and patient." In *Curry*, plaintiff alleged that her physician had revealed confidential information with the "intent and expectation" that her husband would use it in an affidavit in a pending matrimonial action. In each case, those allegations were found not to have stated a cause of action.

We reiterate our conclusion that Missouri would follow and apply the rationale of *Tooley* and *Curry*. *State ex rel. McCloud v. Seier*, 567 S.W.2d 127 (Mo.banc 1978), the final case cited by plaintiff, does not suggest a different conclusion. The broad and general language contained in that case does not support plaintiff's argument.

## IV.

For the reasons stated, we are satisfied that no genuine issue of fact remains to be litigated and that defendant is entitled to partial summary judgment on the issue of liability as a matter of Missouri law. Accordingly, it is

ORDERED (1) that defendant's motion for partial summary judgment on the issue of liability should be and is hereby granted. It is further

ORDERED (2) that the Clerk shall enter final judgment in this case in accordance with the provisions of Rule 58, Fed.R.Civ.P.