Bernard H. TUREEN, Appellee,

v.

EQUIFAX, INC., Appellant.

No. 77–1420.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 18, 1977.

Decided Feb. 21, 1978.

G. Carroll Stribling, Jr., Fordyce & Mayne, St. Louis, Mo., for appellant.

Bruce M. Wurmser (argued), and Theodore D. Ponfil, Clayton, Mo., on brief, for appellee.

Before GIBSON, Chief Judge, HEANEY, Circuit Judge, and HUNTER, District Judge.*

ELMO B. HUNTER, District Judge.

Bernard H. Tureen brought this action for damages resulting from an alleged invasion of his privacy by Equifax, Inc. (hereinafter "defendant"). Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332. Defendant appeals from a jury verdict in favor of plaintiff and against defendant in the amount of $5,000. The relevant facts are as follows.

During 1973 and 1974, plaintiff maintained a health insurance policy with the All-American Insurance Company. In 1973, he suffered a heart attack and in July of that year made a claim for health insurance benefits. Again in February of 1974, following a second heart attack, plaintiff

---

* The Honorable Elmo B. Hunter, United States District Judge, Western District of Missouri, sitting by designation.

made a claim of disability. All-American employed defendant to investigate each of plaintiff's claims. Defendant is an independent consumer reporting firm engaged in the business of investigating and providing information upon request to assist merchants, employers, insurers, etc. in making determinations as to whether to extend credit, hire, insure, etc. a given individual. Defendant conducted its investigation of plaintiff's second claim and issued a report to All-American. That report gives rise to this action.

Plaintiff's second claim was received by All-American in the form of a letter from one of plaintiff's employees. Upon receipt of the letter, Raymond Sawaicki, a claims adjuster for All-American, issued a written request, on a standard form supplied by defendant, for defendant to investigate the question of whether or not plaintiff was totally disabled and therefore entitled to disability insurance benefits. The request form consisted of a series of boxes which could be checked as to the type of investigation requested, and a space in which specific investigation instructions could be given. Sawaicki checked the box for a "special health" investigation, and further requested specifically that defendant make a detailed investigation as to plaintiff's business activities in St. Louis, his business holdings and his degree of participation in the management of his businesses in St. Louis and Florida during the period in question.[1]

On the back of the request form was printed information which directed that in the event a special health investigation was called for, it should answer the questions raised in Equifax Form 37 of the claim investigation report. Form 37 contains the following question:

Claim or underwriting history. (Give all claim history. Give life and health un-

derwriting history to life and health accounts only—not to claim or loss accounts. Auto insurance history may be given to all accounts. If already given, so state: Do not repeat.)

The report submitted to All-American by defendant stated:

FILE DIGEST: A thorough check of our files reveals no previous claim history on Bernard H. Tureen. The last underwriting report was a special life report done on 6–13–68. This report was for Connecticut Mutual Life Insurance Co., 140 Garden St. Hartford, Conn. 06115. The inspection showed Bernard H. Tureen residing at 100 S. New Ballas Road and his occupation was given as President of the American Duplex Corp. 3450 Russell, St. Louis, Mo. Amount applied for was $100,000 and at the time he was carrying $400,000. Beneficiary was the American Duplex Corp. of which he was President.

Insurance history indicates we had reported on 23 occasions to various account numbers for life insurance going back to 1949. Total amount applied for for [sic] life was in excess of $10,000,000 * * *.

We are not quoting the remainder of the 23 insurance companies due to their age. However, if you desire a supplemental listing of these underwriting reports, please advise and we will put this together for you at a later date.

Upon receipt of defendant's report concerning plaintiff, All-American retained the report in its claim department and did not disseminate it to any other persons.

Plaintiff brought this action originally in two counts, one alleging invasion of his privacy as a result of the investigative report, and the second alleging that the report's statements concerning his past insur-

---

1. Those instructions read, "Please contact any neighbors or business sources where Mr. Tureen lived in St. Louis to determine if he has been totally disabled from 11/16 to present. Contact the person who is in charge of managing Mr. Tureen's business in St. Louis. Find out if Mr. Tureen has been flying down to St. Louis regarding his business. If he has not, determine who is in charge of his business in his absence, and if he has been calling or corresponding with Mr. Tureen in regard to his business. Is Mr. Tureen known to have worked in a supervisory capacity, or any sedentary duties during the time which he is claiming total disability? In general, are his activities consistent with those of a totally disabled person? Secure a signed statement from Manager and pursue any leads that you may have."

414

ance history were libelous. Due to the running of the statute of limitations on libel, that count was dismissed as time-barred, and the case proceeded to trial solely on the issue of invasion of privacy.

At the trial, Robert B. Stinson, defendant's insurance claims supervisor who reviewed the final report prior to its being forwarded to All-American, testified that the Equifax Form 37, containing plaintiff's insurance history, was filled out because a special health report had been requested. He stated that insurance companies often find insurance history helpful and necessary to learn of other carriers with coverage on the same risk. Mr. Sawaicki, who issued the written request to defendant, testified that he did not specifically request a report on plaintiff's past insurance history as a part of the investigation, and that he generally weighs each case as to whether past insurance history will be requested. He stated that All-American did not suspect any fraud or misrepresentation on the part of plaintiff in connection with his claim for disability insurance benefits. Sawaicki further testified that he did intend the investigation of plaintiff's claim to include everything which was included on the request form.

Robert C. Nixon, defendant's employee who investigated and answered the questions contained on defendant's Form 37, testified that he did so by going to defendant's file on plaintiff, pulling the last several insurance reports which had been made, and listing the information contained within the last report. Mr. Nixon stated that prior underwriting history is a standard item routinely reported upon at the request of insurance companies faced with claims.

Over defendant's objection as to relevancy, plaintiff was allowed to testify that he had *not* applied on 23 prior occasions for $10,000,000 worth of life insurance, as stated in defendant's report. Plaintiff asserted that he had made at most eight to ten applications for insurance from 1931 to the date of the trial, and that the total value of all such applications had not been over half a million dollars. He stated that the lan-

guage of the report caused him great anguish because it made him look like a potential suicide. He also testified that the report had upset him and caused him great concern and loss of sleep.

At the close of all the evidence, defendant filed its Motion for Directed Verdict. Reserving its ruling on defendant's motion, the district court submitted the case to the jury on the following instruction:

Plaintiff, Mr. Tureen, must establish by a preponderance of the evidence: (1) that the information contained in the investigative report stamped March 19, 1974, relating to his past applications for life and health insurance, was not reasonably needed to determine whether the claim for Mr. Tureen's illness was justified; and (2) that defendant's conduct was such that it was offensive, unreasonable, serious and unwarranted to a person of ordinary sensibilities.

Counsel for defendant expressly did not object to the law as expressed in that verdict-directing instruction, but did object that there was no evidence in the record to support the giving of the instruction. The trial court further instructed the jury that:

If you find the issues in favor of the plaintiff then you must award the plaintiff such sum as you find will fairly and justly compensate the plaintiff for any damages you find Mr. Tureen sustained and is reasonably certain to sustain in the future as a direct result of the investigation of the report of March 19, 1974.

Defendant objected to the damage instruction on the basis that there was no evidence of damage to plaintiff, and no evidence of any future damage.

Following the jury's verdict for plaintiff, defendant filed its Motion for Setting Aside Verdict and Judgment in Accordance With Motion for a Directed Verdict or in the Alternative Motion for a New Trial. This timely appeal followed a denial of defendant's motion.

Defendant first contends that the trial court erred in denying defendant's motion for directed verdict at the close of the evidence. We agree.

The origin of the tort of invasion of privacy is commonly traced to an article by Warren and Brandeis in the Harvard Law Review of 1890,[2] which was prompted by the authors' concern with the invasion of privacy by newspapers.[3] Their concern also extended to other aspects of their "modern" society:

> If we are correct in this conclusion [the existence of a right to privacy based on an inviolate personality], the existing law affords a principle which may be invoked to protect the privacy of the individual from invasion either by the too enterprising press, the photographer, or the possessor of any other modern device for recording or reproducing scenes or sounds.

Warren and Brandeis, *supra* at 206.

The basis of the right of privacy is the right to be let alone. *Barber v. Time, Inc.*, 348 Mo. 1199, 159 S.W.2d 291, 294 (1942). *See Restatement (Second) of Torts* § 652A, at 376 (1977); W. Prosser, *Handbook of the Law of Torts* § 117, at 832 (4th ed. 1971). It has been suggested that what is actually involved is "appropriation of an interest in personality * . * * which recognizes that the individual does not exist solely for the state or society but has inalienable rights which cannot be lawfully taken from him, so long as he behaves properly." *Barber v. Time, Inc., supra*, 159 S.W.2d at 294.

Missouri law first recognized the tort of invasion of privacy in *Munden v. Harris*, 153 Mo.App. 652, 659–60, 134 S.W. 1076, 1078–79 (1911). That decision also noted the necessity of harmonizing individual rights with community and social interests in establishing conditions of liability for invasion of the right of privacy.

> [I]t ought also to be understood that the right of privacy does not extend so far as to subvert those rights which spring from social conditions, including business relations. By becoming a member of society one surrenders those natural rights which are incompatible with social conditions.

*Munden v. Harris, supra*, 134 S.W. at 1079. The same concern was reiterated by the Missouri Supreme Court in the leading case of *Barber v. Time, Inc., supra*, 159 S.W.2d at 295–96, and subsequent Missouri cases have involved the balancing of public and private interests. *See Langworthy v. Pulitzer Publishing Co.*, 368 S.W.2d 385 (Mo. 1963); *Williams v. KCMO Broadcasting Div.-Meredith Corp.*, 472 S.W.2d 1 (Mo.App. 1971).

Dean Prosser has identified and described four generally recognized tort actions for invasion of privacy: intrusion, public disclosure of private facts, false light in the public eye, and appropriation. W. Prosser, *Handbook of the Law of Torts* § 117, at 833, 834, 837, 839 (4th ed. 1971). The American Law Institute, following Prosser's classifications, has recognized the general principle that the right of privacy is invaded by (1) unreasonable intrusion upon the seclusion of another, (2) appropriation of the other's name or likeness, (3) unreasonable publicity given to the other's private life, or (4) publicity that unreasonably places the other in a false light before the public. *Restatement (Second) of Torts* §§ 652A–652E (1977). The circumstances presented in this case—investigation of plaintiff by a retail credit company at the request of its client, plaintiff's insurance carrier, and disclosure of certain information about plaintiff to the insurance company—must be examined in connection with two of the above actions: intrusion and public disclosure.

In considering defendant's conduct as an intrusion, this court is aware that proponents for regulation of the consumer re-

---

**2.** Warren and Brandeis, The Right to Privacy, 4 Harv.L.Rev. 193 (1890).

**3.** "The press is overstepping in every direction the obvious bounds of propriety and of decency. Gossip is no longer the resource of the idle and of the vicious, but has become a trade, which is pursued with industry as well as ef-

frontery. *To satisfy a prurient taste the details of sexual relations are spread broadcast in the columns of the daily papers. To occupy the indolent, column upon column is filled with idle gossip, which can only be procured by intrusion upon the domestic circle.*" Warren and Brandeis, *supra* at 196.

porting industry usually point to insurance investigations as the type of conduct most likely to intrude upon the consumer's right of privacy. 57 *Geo.L.J.* 509, 525 (1969). Certain objectionable snooping techniques used by consumer reporting companies could be considered an intrusion violative of the right of privacy. *See McNally v. Pulitzer Publishing Co.*, 532 F.2d 69 (8th Cir.), *cert. denied*, 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976), concerning the conduct of newspaper reporters; Note, "Constitutional Right of Privacy and Investigative Consumer Reports; Little Brother Is Watching You," 2 *Hastings Const.L.Q.* 773, 775–77 (1975).

■ The instant case, however, does not contain evidence of objectionable snooping techniques on the part of defendant. Defendant obtained the information about which plaintiff complains merely by means of searching defendant's own files containing a summary of defendant's own prior reports on plaintiff, hardly an act which intruded in any manner upon plaintiff. Because defendant's technique was not objectionable, any intrusion giving rise to a cause of action for invasion of Mr. Tureen's privacy must stem from the fact that defendant *collected* and *retained* the information concerning plaintiff's past insurance history.

We are not unmindful of the potential for abuse in the collection and retention of consumer reporting information.[4] We do not rule out the possibility that instances may exist where the collection of highly personal information irrelevant to *any* legitimate business purpose might constitute an invasion of privacy by unreasonable intrusion.[5] This, however, is not such a case.

■ In today's mobile society, there is a legitimate business need for consumer reports, which serve such important public functions as minimizing the risks of extending valuable benefits and credit and assisting in detection of fraudulent credit applications and insurance claims. In order to make informed judgments in these matters, it may be necessary for the decision maker to have information which normally would be considered private, provided the information is legitimately related to a legitimate purpose of the decision maker. In such a case, the public interest provides the defendant a shield which is similar in principle to qualified privilege in libel. *Barber v. Time, Inc., supra*, 159 S.W.2d at 295. Some factual situations so clearly and unquestionably do not result in an invasion of privacy that the court should so declare as a matter of law. *Langworthy v. Pulitzer Publishing Co., supra*, 368 S.W.2d at 390. This is such a case. Because there may be a legitimate purpose for the collection and even the disclosure, in certain circumstances, of an individual's past insurance history,[6] we must conclude as a matter of law from the record before us that defendant did not invade plaintiff's privacy merely by

4. During the 1960's, concern over abusive credit reporting practices developed, and the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, was passed. There is strong evidence that abusive practices continue. *See* Note, *supra*, 2 *Hastings Const.L.Q.* 773 (1975); Note, 80 *Yale L.J.* 1035 (1971); Note, "Protecting Privacy in Credit Reporting," 25 *Stan.L.Rev.* 550 (1972); Comment, "Protection of the Consumer Interests and the Credit Rating Industry," 2 *Pac.L.J.* 635 (1971); Comment, "Consumer Protection: Regulation and Liability of the Credit Reporting Industry," 47 *Notre Dame Law.* 1291 (1972); Comment, "Commercial Credit Bureaus: The Right to Privacy and State Action," 24 *Am.U.L. Rev.* 421 (1975); *see also* Note, "Qualified Privilege to Defame Employees and Credit Applicants," 12 *Harv.Civ.Rights-Civ.Lib.L.Rev.* 143 (1977).

5. *See McNally v. Pulitzer Publishing Co.*, 532 F.2d 69, 79 (8th Cir. 1976), *cert. denied*, 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976), concerning the conduct of newspaper publishers and reporters.

6. The evidence in this case, produced by plaintiff's own witnesses, illustrates that prior underwriting history is useful in determining the amount of disability insurance carried by a claimant, in providing leads as to important prior health history and other information, and in detecting suspected fraudulent claims. *See* Note, 80 *Yale L.J.* 1035, 1041 (1971): "There is no satisfactory, economical substitute for a credit bureau report."

collecting and retaining his past insurance history.[7]

The fact that information may have been properly collected and retained, however, does not mean that its disclosure by the reporting company was proper.[8] Certainly, indiscriminate publication of private information unrelated to any legitimate public purpose could, and should, give rise to an action for invasion of privacy.

■ Missouri substantive law, which controls in this diversity action, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1937); *Johnson v. State Farm Mutual Auto Insurance*, 252 F.2d 158, 164 (8th Cir. 1958), specifically recognizes a cause of action in tort for the public disclosure of private facts. *See Barber v. Time, Inc., supra*, 159 S.W.2d at 295–96; *Langworthy v. Pulitzer Publishing Co., supra*, 368 S.W.2d at 389–90; *Williams v. KCMO Broadcasting Div.-Meredith Corp., supra* 472 S.W.2d at 3. Elements of the tort include (1) publication, (2) absent any waiver or privilege, (3) of private matters in which the public has no legitimate concern, (4) so as to bring shame or humiliation to a person of ordinary sensibilities. *See W. Prosser, supra*, § 117, at 810–12; *Langworthy v. Pulitzer Publishing Co., supra*, 368 S.W.2d at 389–90; *Williams v. KCMO Broadcasting Div.-Meredith Corp., supra*, 472 S.W.2d at 3–4. *See also McNally v. Pulitzer Publishing Co.*, 532 F.2d 69, 78 (8th Cir.), *cert. denied*, 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976).

Although the parties have directed themselves in this appeal primarily to the question of whether or not there was a public interest in the information disclosed by defendant to All-American Insurance Company, and whether a public interest is required to be present, we need not reach that issue for the reason that the essential element of publication is absent from the evidence in this case.[9]

The *Restatement (Second) of Torts* § 652D, at 383 (1977), articulates the tort of public disclosure of private facts by stating that "[o]ne who gives *publicity* to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter *publicized* is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." [Emphasis supplied.] The Comment following § 652D of the *Restatement* identifies the degree of "publicity" required to give rise to an action for invasion of privacy:

The form of invasion of the right of privacy covered in this Section depends upon publicity given to the private life of the individual. "Publicity," as it is used in this Section, differs from "publication," as that term is used in § 577 in connection with liability for defamation. "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.

Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication

---

7. *See McNally v. Pulitzer Publishing Co.*, 532 F.2d 69, (8th Cir.), *cert. denied*, 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976), where this court determined that a newspaper does not commit intrusion by its mere receipt of tortiously obtained private facts, even when the newspaper has actual knowledge of such impropriety.

8. Nor does this court express any opinion as to whether defendant has violated any provisions of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*

9. Defendant's motion for directed verdict at the close of all the evidence preserved this issue for our consideration. *See Cox v. United States*, 284 F.2d 704, 709 (8th Cir. 1960).

in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in other words, is one between private and public communication.

*See also* Prosser, *supra*, § 117, at 810 (4th ed. 1971).

The same conclusion was reached by the district court in *Wilson v. Retail Credit Co.,* 325 F.Supp. 460, 463 (S.D.Miss.1971), aff'd, 457 F.2d 1406 (5th Cir. 1972), an action brought against a reporting agency alleging libel and invasion of privacy with respect to reports made on the plaintiff and his wife. The court, noting that Georgia law recognized the four categories of invasion of privacy, and identifying the tort of public disclosure of private facts as the second of those four categories, quoted an earlier decision by the district court for the Northern District of Georgia in the case of *Peacock v. Retail Credit Co.,* 302 F.Supp. 418 (N.D.Ga. 1969), aff'd, 429 F.2d 31 (5th Cir. 1970), as follows:

> Plaintiff's attempt to recover under category (2), on the theory that the credit report amounted to a public disclosure of embarrassing private facts about him, must likewise fail, for the simple reason that there has been no "public" disclosure of any information concerning plaintiff. Only clients of Retail Credit have been supplied with this information, and while this limited publication may have resulted

in the denial of an insurance policy, or a denial of credit, the court holds that this is not the type of public disclosure required to establish an invasion of privacy under category (2).

Accordingly, the district court held that the defendant was entitled to judgment as a matter of law. Although the decision in *Wilson v. Retail Credit, supra,* was the result of the district court's interpretation of Georgia law, it is in accordance with the generally-held view on this issue, as expressed in the *Restatement (Second) of Torts.*[10]

Missouri law accords. Although the publicity required to constitute the tort of public disclosure of private facts has not specifically been defined in Missouri, each Missouri case has involved publicity in the form of an advertisement,[11] newspaper,[12] magazine,[13] or television[14] account, or language spoken to a sizeable group of people in a public place.[15] Implicit in the language of the cases is the conclusion that invasion of privacy requires publicity in the broad, general sense of the word "public."

Illustrative is the case of *Munden v. Harris, supra,* 134 S.W. at 1077. The Missouri Supreme Court, recognizing for the first time the existence of the right of privacy in Missouri, quoted with approval the language of an earlier New York decision[16] in stating that "[t]he so-called right of privacy is, as the phrase suggests, founded upon the claim that a man has the right to pass through this world, if he wills, without having his picture published, his business enterprises discussed, his successful experiments

---

10. For example, *Black's Law Dictionary* 1393 (4th ed. 1968), defines "public," in pertinent part: "Pertaining to a state, nation, or whole community; proceeding from, relating to, or affecting the whole body of people or an entire community. Open to all; notorious. Common to all or many; general; open to common use. [Omitting citations.] Belonging to the people at large; relating to or affecting the whole people of a state, nation, or community; not limited or restricted to any particular class of the community. [Omitting citations.]"

11. *Munden v. Harris, supra,* 134 S.W. 1076.

12. *Langworthy v. Pulitzer Publishing Co., supra,* 368 S.W.2d 385.

13. *Barber v. Time, Inc., supra,* 159 S.W.2d 291.

14. *Williams v. KCMO Broadcasting Div.-Meredith Corp., supra,* 472 S.W.2d 1.

15. *Biederman's of Springfield, Inc. v. Wright,* 322 S.W.2d 892 (Mo.1959).

16. *Roberson v. Rochester Folding Box Co.,* 171 N.Y. 538, 64 N.E. 442 (1902). The *Roberson* decision rejected the view that such a right of privacy existed.

written up for the benefit of others, or his eccentricities commented upon, either in *handbills, circulars, catalogues, periodicals, or newspapers  *  *  *.*" [Emphasis supplied.] Similarly, in *Barber v. Time, Inc., supra,* 159 S.W.2d at 293, 295, the Missouri Supreme Court defined the "limits of decency" in terms of "publicity" given to the intimate details of an individual's life, stated that the plaintiff's previous habits with reference to "publicity" were a factor for the court to consider, and concluded that defendant therein was liable for having caused embarrassing information about the plaintiff to be "circulated generally throughout the community."

The Missouri Supreme Court's decision in *Biederman's of Springfield, Inc. v. Wright,* 322 S.W.2d 892, 895–7 (1959), emphasizes the public aspect of disclosure in an invasion of privacy action in holding that the giving of undue publicity to private debts constitutes an invasion of the debtor's right of privacy. Of particular significance in the *Biederman's* case is the Missouri Supreme Court's reliance on Prosser, *Handbook of the Law of Torts* (2d ed.) § 97 at 641. At page 898 of its opinion, the Court quoted with approval the following language, which echoes the position adopted in the *Restatement of Torts*:

> Except in cases of physical intrusion, it has been held that the tort must be founded upon publicity, in the sense of communication to the public in general or to a large number of persons, as distinguished from one individual or a few.

■ Our examination of Missouri law, which is in accordance with the view set forth in the *Restatement (Second) of Torts,* thus leads to the conclusion that there must be evidence of publicity in the sense of a disclosure to the general public or likely to reach the general public, as opposed to "publication" required in a defamation action, in order for plaintiff to make a submissible case of invasion of privacy by public disclosure of private facts. *See Restatement (Second) of Torts,* § 652D, at 383 (1977); W. Prosser, *Handbook of the Law of Torts* § 117 (4th ed. 1971); *Munden v. Harris, supra,* 134 S.W. at 1077; *Barber v. Time, Inc., supra,* 159 S.W.2d at 293, 295; *Biederman's of Springfield, Inc. v. Wright, supra,* 322 S.W.2d at 898. *See also Wilson v. Retail Credit Co., supra,* 325 F.Supp. at 463.

■ In view of the evidence in this case, which reveals only a disclosure by defendant to its client, All-American Insurance Company, without further dissemination of the information about plaintiff,[17] we conclude that the district court erred in denying defendant's motion for directed verdict at the close of the evidence.

We need not, and do not, reach the other issues raised on this appeal.

For the foregoing reasons, the judgment is reversed and the case is remanded to the district court with instructions to enter judgment for defendant.

HEANEY, Circuit Judge, dissenting.

I agree with the majority's holding that the collection and retention of the plaintiff's past insurance history by Equifax did not constitute an invasion of his privacy by unreasonable intrusion. There is no substantial evidence that the manner of the procurement of this information constituted an offensive interference with the plaintiff's affairs,[1] or that the information col-

---

17. We note that the evidence reveals that defendant does *not* operate its business by means of a computer. There is no indication in the record that the information about which plaintiff complains was obtained from or placed in a computer bank or information bureau by means of which it might reasonably be expected to be more widely disseminated. The possible implications of that fact situation, therefore, are not before this court.

1. Private investigations utilizing fraudulent misrepresentations, over zealous surveillance and other unreasonably intrusive techniques for the gathering of information about an insurance claimant or credit applicant may give rise to a cause of action for damages for invasion of privacy by unreasonable intrusion. *See Noble v. Sears, Roebuck and Co.,* 33 Cal.App.3d 654, 109 Cal.Rptr. 269 (1973); *Tucker v. American Employers' Insurance Company,* 171 So.2d 437 (Fla.Dist.Ct.App.1965); *Souder v. Pendleton*

lected was of such a personal nature or so unrelated to any legitimate business purpose that its collection and retention by Equifax constituted *ipso facto* an invasion of the plaintiff's right to privacy.[2] *See Pearson v. Dodd*, 133 U.S.App.D.C. 279, 410 F.2d 701, 704, *cert. denied*, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969); *Beaumont v. Brown*, 65 Mich.App. 455, 465–466, 237 N.W.2d 501, 505–506 (1975). *Cf. Liberty Loan Corporation of Antioch v. Brown*, 493 S.W.2d 664 (Mo.App.1973).

I disagree, however, that there is insufficient evidence of "publicity" to justify submission of the case to the jury under the theory of public disclosure of private facts. As acknowledged by the majority, the common law tort of public disclosure of private facts requires "a communication that reaches, *or is sure to reach*, the public." Restatement (Second) of Torts § 652D, Comment a at 384 (1977) (emphasis added). *See also Biederman's of Springfield, Inc. v. Wright*, 322 S.W.2d 892, 898 (Mo.1959). The likelihood of widespread dissemination can be inferred from the medium employed by the defendant for the particular publication, *see Barber v. Time, Inc.*, 348 Mo. 1199, 159 S.W.2d 291 (1942) (magazine article) *and Williams v. KCMO Broadcasting Div.—*

*Meredith Corp.*, 472 S.W.2d 1 (Mo.App.1971) (television broadcast), or from the defendant's action in making private information available to the public where that action is likely to result in the further dissemination of the information. *See Ind. Foundation, Etc. v. Texas Ind. Acc. Bd.*, 540 S.W.2d 668, 683–684 (Tex.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977).[3]

In my view, the collection and retention of personal information about a particular consumer by a commercial information broker such as Equifax makes the dissemination of that information sufficiently likely as to meet any reasonable requirement of "publicity."[4] Equifax, formerly known as Retail Credit Company, has more than 2,000 locations across the continent and is the largest individual consumer investigative firm in the country.[5] Approximately 46 million consumer files are maintained by Equifax, and the corporation claims to make some 35 million reports on consumers each year.[6] Evidence at trial indicated that once a report on a particular consumer is made, a copy of that report is retained in the files of the reporting office for use in later reports about the same individual requested by the same or a different customer.[7] Upon request from another office, a

Detectives, 88 So.2d 716 (La.App.1956); Note, *Constitutional Right of Privacy and Investigative Consumer Reports: Little Brother Is Watching You*, 2 Hastings Const.L.Q. 773, 789–790 (1975).

**2.** *See* Comment, *Protection of the Consumer Interests and the Credit Rating Industry*, 2 Pac. L.J. 635, 652 (1971); Note, *Credit Investigations and the Right to Privacy: Quest for a Remedy*, 57 Geo.L.J. 509, 525 (1969). Unrelated personal information is routinely collected and disseminated by the preparers of investigative consumer reports. *See* Hearings on S. 823 Before the Subcomm. on Financial Institutions of the Senate Comm. on Banking and Currency, 91st Cong., 1st Sess. 310–311 (1969); Hearings on H.R. 16340 Before the Subcomm. on Consumer Affairs of the House Comm. on Banking and Currency, 91st Cong., 2d Sess. 478–485 (1970).

**3.** In *Ind. Foundation, Etc. v. Texas Ind. Acc. Bd.*, 540 S.W.2d 668 (Tex.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977), the court held that where government records containing private information pertain-

ing to individuals are opened to public inspection, the information is sufficiently "publicized" as to give rise to a cause of action for invasion of privacy by public disclosure of private facts. "To hold otherwise would be to deny an individual any protectable privacy interest in private information disclosed to a governmental unit, if such information would otherwise be 'public information'." *Id.* at 684.

**4.** *See* Note, *Credit Investigations and the Right to Privacy: Quest for a Remedy, supra* at 524.

**5.** *See* Note, *Constitutional Right of Privacy and Investigative Consumer Reports: Little Brother Is Watching You, supra* at 773, 774 n. 4.

**6.** *Ibid.*

**7.** Not only is potentially adverse information copied by investigators from prior reports, but the reports in which the information was originally contained have often been destroyed, making the original source of the information impossible to ascertain. Evidence in this case indicated that the information about which the

copy of the report is sent to the requesting office for dissemination to its local customers. A copy of the report which was the subject of the present suit was sent to the Fort Lauderdale, Florida, branch office, apparently in anticipation of requests for information about the plaintiff in that locale.

The majority cites *Peacock v. Retail Credit Company*, 302 F.Supp. 418 (N.D.Ga. 1969), aff'd, 429 F.2d 31 (5th Cir. 1970), in support of its holding. In *Peacock*, reports containing private information about the plaintiff were distributed to insurance companies, banks and other businesses requesting such information. The court held that no public disclosure of private information had occurred since "[o]nly clients of Retail Credit have been supplied with this information;" and as assurance against further dissemination, the court cited the presence of a clause in the contract between Retail and its customers, requiring that the information reported and Retail's identity as the source be kept "strictly confidential." *Id.* at 423. I find this analysis wholly inadequate. The dissemination of private information by a commercial credit broker to insurance companies, banks and other customers requesting such information is no less "public" than the posting of a debt in a creditor's shop window.[8] Nor does the fact that the information in issue in that case had been disseminated to only a few customers, or that the contract between Retail and its customers limited further dissemina-

tion by the latter, limit future dissemination by Retail itself in any way or make that dissemination any less likely.

Even if there is substantial evidence tending to show that the elements of a cause of action for invasion of privacy have been met,[9] a verdict in favor of the defendant must be directed if the defendant's conduct serves any basic public interest which outweighs the individual right infringed. *See Barber v. Time, Inc.*, 348 Mo. 1199, 1206–1207, 159 S.W.2d 291, 295 (1942); *McNally v. Pulitzer Pub. Co.*, 532 F.2d 69, 78 (8th Cir.), cert. denied, 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976). The determination as to what is a matter of sufficient public interest is similar in principle to the determination as to the existence of a qualified privilege in libel. *Barber v. Time, Inc., supra*, 348 Mo. at 1207, 159 S.W.2d at 295. *See* Restatement (Second) of Torts § 652G (1977); W. Prosser, Handbook of the Law of Torts § 117, at 817–818 (1971).

Most jurisdictions have granted credit bureaus and other consumer investigative agencies a conditional privilege in defamation and invasion of privacy actions under the theory that the information supplied by these companies is useful to society in preventing the improvident extension of credit or the payment of fraudulent insurance claims.[10] Assuming that such reports would be conditionally privileged under Missouri law,[11] that privilege would not pro-

plaintiff complains was copied from previous reports in the files of the St. Louis office; that office, however, had no records showing the origin of the information, and when asked whether such information could exist in the files of other offices, the St. Louis branch manager replied that he doubted it.

8. Restatement (Second) of Torts § 652D, Comment a, Illustration 2 (1977).

9. In addition to publicity, the plaintiff must establish that the defendant's conduct was offensive, unreasonable, serious and unwarranted to a person of ordinary sensibilities. *See Williams v. KCMO Broadcasting Div.—Meredith Corp.*, 472 S.W.2d 1, 4 (Mo.App.1971); *Barber v. Time, Inc.*, 348 Mo. 1199, 1207, 159 S.W.2d 291, 295 (1942). The trial court held that there was sufficient evidence establishing this element to justify submission of the case to the jury. I would agree.

10. *See, e. g., Wilson v. Retail Credit Company*, 325 F.Supp. 460, 463 (S.D.Miss.1971), aff'd, 457 F.2d 1406 (5th Cir. 1972); *Bartels v. Retail Credit Company*, 185 Neb. 304, 308, 175 N.W.2d 292, 296 (1970); *H. E. Crawford Company v. Dun & Bradstreet, Inc.*, 241 F.2d 387, 393 (4th Cir. 1957). The protection of the qualified privilege was denied to the credit reporting industry in the following libel cases: *Hood v. Dun & Bradstreet, Inc.*, 486 F.2d 25 (5th Cir. 1973), cert. denied, 415 U.S. 985, 94 S.Ct. 1580, 39 L.Ed.2d 882 (1974); *Retail Credit Company v. Russell*, 234 Ga. 765, 218 S.E.2d 54 (1975); *Pacific Packing Company v. Bradstreet Co.*, 25 Idaho 696, 139 P. 1007 (1914).

11. The appellate courts of Missouri apparently have not yet addressed the question as to whether consumer investigative agencies should receive the protection of such a conditional privilege. Those cases which have

tect the disclosure made here. A conditional privilege extends only to the publication of information which bears upon the public interest which is entitled to protection. *See* W. Prosser, *supra* § 115, at 792; Restatement (Second) of Torts § 605 (1977). The public interest asserted by Equifax—that of determining the validity of the plaintiff's insurance claim—was not served by publication of the fact that the plaintiff had applied for life insurance "in excess of $10,-000,000" since 1949. Even if, as urged by Equifax, *current* applications for life insurance might contain relevant medical information bearing on the question of present disability, applications made twenty-five years ago certainly would not.[12]

Consumer reporting has become a multimillion dollar industry,[13] with files maintained on millions of Americans.[14] Justice Douglas, in describing governmental collection and dissemination of personal information, has stated:

> We are rapidly entering the age of no privacy, where everyone is open to surveillance at all times; where there are no secrets from government.
>
>    *     *     *     *     *     *
>
> The dossiers on all citizens mount in number and increase in size. Now they are being put on computers so that by pressing one button all the miserable, the sick, the suspect, the unpopular, the offbeat people of the Nation can be instantly identified.
>
> These examples and many others demonstrate an alarming trend whereby the privacy and dignity of our citizens is being whittled away by sometimes imperceptible steps. Taken individually, each step may be of little consequence. But when viewed as a whole, there begins to emerge a society quite unlike any we have seen—a society in which government may intrude into the secret regions of man's life at will.

*Osborn v. United States*, 385 U.S. 323, 341–343, 87 S.Ct. 429, 439, 17 L.Ed.2d 394 (1966) (Douglas, J., dissenting) (footnote omitted).

In my view, the potential for abuse by the commercial consumer reporting industry is no less real. The dissemination of personal information must be limited to that which serves those legitimate business needs which such companies cite to justify their existence. Otherwise, we may indeed be threatened with the loss of the very core of personal privacy: control over the dissemination of information about ourselves.[15]

---

stressed the balancing of the individual right of privacy against community interests have involved freedom of the press. *See Barber v. Time, Inc., supra; Williams v. KCMO Broadcasting Div.—Meredith Corp., supra.*

**12.** The irrelevance of this information is acknowledged in the report, where, after three insurance carriers are listed, it is stated that "[w]e are not quoting the remainder of the 23 insurance companies due to their age." The branch manager of the St. Louis office of Equifax testified that underwriting files for life insurance applicants are routinely destroyed after a period of 13 months, five years, or ten years, apparently because any information contained therein would be obsolete. *See also* Fair Credit Reporting Act, 15 U.S.C. § 1681c(a)(1)–(6) (1970), which prohibits in most instances the reporting of adverse information which is more than seven years old.

**13.** Total revenues of Retail Credit Company were $195,262,000 in 1972. FTC, *In the Matter of Equifax, Inc.*, para. 12, at 10 (1977) (initial decision).

**14.** Credit Data Corporation, the nation's second largest individual consumer reporting firm, maintains files on some 27 million persons and is reportedly adding new files at the rate of one-half million per month. Comment, *Protection of the Consumer Interests and the Credit Rating Industry*, 2 Pac.L.J. 635, 636 (1971). Almost all of Credit Data's operations are computerized, *id.*, and when asked in 1968 how long it would take before every American's name was listed with the corporation, its president replied, "we regard it as approximately a five-year job." Comment, *Commercial Credit Bureaus: The Right to Privacy and State Action*, 24 Am.U.L.Rev. 421, 424 (1975).

**15.** *See* Note, *Constitutional Right of Privacy and Investigative Consumer Reports: Little Brother Is Watching You, supra* at 773, 775, 825; Note, *Protecting Privacy in Credit Reporting*, 24 Stan.L.Rev. 550 (1972); Note, *Credit Investigations and the Right to Privacy: Quest for a Remedy, supra* at 524, 532.