**Nancy K. WOOD, Plainitff,**

v.

**NATIONAL COMPUTER SYSTEMS, INC., Defendant.**

**Civ. No. 86–2008.**

United States District Court,
W.D. Arkansas,
Fort Smith Division.

Sept. 23, 1986.

Charles Karr, Martin, Vater & Karr, Fort Smith, Ark., for plaintiff.

William H. Sutton and Elizabeth J. Robben, of Friday, Eldredge & Clark, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### Introduction

In 1985 the Arkansas Legislature undertook to upgrade the Arkansas public education system by legislative enactments in a number of areas. One of the actions taken by the legislature was the enactment of Act No. 350 of 1985 (Ark.Stat.Ann. § 80–1270 *et seq.*) known as the Certified Personnel Testing Program. This legislation required, among other things, that all "certified personnel employed by public schools of this state shall undergo testing of their functional academic skills, including, but not limited to, reading, writing and mathematics." Relevant provisions of the statute provided that:

"Any teacher, administrator or other certified person who has not satisfactorily completed the test required by this Section shall not be eligible for recertification at the expiration of the certificate held by the teacher, administrator or other certified person on January 1, 1985, until such time as the teacher, administrator or other certified person does take the required test and score at or above the level for satisfactory completion."

Provisions of the law allow teachers who initially failed the test to continue to teach on a temporary certificate which shall expire not later than June 1, 1987, and the teachers may retake the test during that period and, upon attaining a passing grade, retain their certification. *See* Ark.Stat. Ann. § 80–1270.1.

This comprehensive teacher testing program was a result of the general concern in Arkansas and, in fact, throughout the nation, about the quality of education available in our public schools. The Arkansas testing program was reported at the time of the enactment of the legislation to be the first of its kind in the United States. This legislation was accompanied by other legislation which increased taxes to provide additional funds for education, and included a pay raise for Arkansas teachers. Certain portions of the legislation were controversial, to say the least, and the provisions requiring teacher testing drew substantial organized opposition from the teachers' union, the Arkansas Education Association. In fact, the testing program became a "hot" political issue in Arkansas and feelings about the test ran high, especially among organized teachers. Organized boycotts of the test were threatened and, in fact, numerous teachers refused to take the test when it was initially given.

### Uncontroverted Facts

To carry out the provisions of the legislation, the Arkansas State Board of Education contracted with Instructional Objectives Exchange of Culver City, California, to develop a test that would assess the

basic skills of Arkansas teachers. Instructional Objectives Exchange, in turn, entered into an agreement with Intran Corporation, and this agreement was subsequently assigned to the defendant, to print the test, score the objective portion of it, and return all of the scores to the Arkansas State Board of Education and to the individual teachers and administrators at the addresses provided by them. To return the test scores to the teachers and administrators involved, the defendant produced a computer-generated gummed name and address label for each teacher and administrator who took the exam. The labels were affixed to standard business envelopes. Some score reports were inadvertently inserted into envelopes addressed to a person other than the person named on the score report, and some teachers received another person's score.

Plaintiff, Nancy K. Wood, is a teacher at Immaculate Conception Grade School in Fort Smith, Arkansas. She took the test on September 21, 1985. On Friday, December 6, plaintiff received another teacher's score report. Plaintiff called other Fort Smith teachers and found that some of them had also received another person's score report. On the day that Mrs. Wood received the wrong report, her husband, who is also a school teacher, called a news media representative of a local television station and reported the mix-up. The news media representative called Mrs. Wood, and she agreed to an on-camera interview the following day (Saturday afternoon). That Saturday, she attended her daughter's ballgame and submitted to the interview at Channel 5 in Fort Smith.

By Tuesday, December 10, plaintiff had received her own score report and she returned the one that she had received to the sender in an envelope provided by the sender for that purpose. On Thursday, December 12, two days after she received her score, she filed a complaint in the Circuit Court of Sebastian County, Arkansas, alleging that the defendant, through its "negligent" mailing of the incorrect score report caused plaintiff to suffer "mental anguish" and "extreme emotional distress." The complaint further alleged that the defendant invaded the privacy of plaintiff by "publicly disclosing private acts of plaintiff." Plaintiff seeks $25,000.00 in compensatory damages and $100,000.00 in punitive damages.

The matter was removed to this court and the court has jurisdiction under the provisions of 28 U.S.C. §§ 1441(b) and 1332 by reason of diversity of citizenship and jurisdictional amount.

## Summary Judgment

Relying on the affidavit of one of its employees, and the deposition of Mrs. Wood, the defendant moved for summary judgment. After considering the motion and supporting and controverting materials, and the briefs of the attorneys for the parties, the court finds that there is no genuine issue of any material fact in relation to any of the theories under which the plaintiff seeks to recover and that, for this reason, the motion for summary judgment should be granted. In making this determination, the court is not unmindful of the "death rate" on appeal of granted Rule 56 motions. In spite of this, the court has determined that if there was ever a case in which Rule 56 should be invoked, this is it.

The court recognizes that Rule 56 motions are a drastic remedy which "should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues." 10 Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2712 at 588; *Inland Oil and Transport Co. v. U.S.*, 600 F.2d 725 (8th Cir.1979). As Professor Miller points out in this article, some courts have been prone to read into Rule 56 requirements that are not present, such as the statement by earlier courts that summary judgments are not to be granted where there is "the slightest doubt" as to the facts. 10 Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2712 at 583; *Traylor v. Black, Sivalls & Bryson, Inc.*, 189 F.2d 213 (8th Cir.1951).

That overly restrictive application of Rule 56 should have been laid to rest in the

recent United States Supreme Court case of *Anderson v. Liberty Lobby, Inc.*, 54 U.S.L.W. 4755 (U.S. June 25, 1986). In that case the Court announced the rule to be followed in ruling on summary judgment motions as follows:

> If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."

*Anderson, supra,* (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872).

Thus, as the court understands its role in ruling on Rule 56 motions, it is permitted to determine whether there are any factual issues in dispute from which reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. If the court, after viewing the submitted materials in this light, determines that there are no genuine issues of any material facts from which a reasonable juror could find for the plaintiff, then the motion should be granted. As Professor Miller said in the above cited article, at p. 589:

> However, cases voicing the sentiment that the courts should be slow to grant a summary judgment or that the motion should be granted very reluctantly and only in clear cases (citing cases) must be evaluated in light of their facts. (citing cases). The rule itself provides that "the judgment sought shall be rendered forth-

with if * * * there is no genuine issue as to any material fact and * * * the moving party is entitled to judgment as a matter of law." When those requirements are met the procedure should be viewed with favor and applied according to its terms. (citing cases).

### Infliction of Emotional Distress

One of the bases on which the plaintiff seeks to recover is that the defendant by its negligence or gross negligence proximately caused plaintiff to "suffer embarrassment, humiliation, anxiety, mental anguish, and extreme emotional distress." Additionally, it is alleged in the complaint that defendant's "conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community."

The language of plaintiff's complaint in this respect obviously comes from the landmark opinion of Justice John A. Fogleman of the Arkansas Supreme Court in *M.B.M. Company, Inc. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980). Prior to the *Counce* decision, this tort (if it was one) had a checkered history in Arkansas. See, for example, *Dalrymple v. Fields*, 276 Ark. 185, 633 S.W.2d 362 (1982); *Geyer v. Western Union Telegraph Co.*, 192 Ark. 578, 93 S.W.2d 660 (1936); *Wilson v. Wilkins*, 181 Ark. 137, 25 S.W.2d 428 (1930). Justice Fogleman's decision in *Counce, supra,* more than adequately sets forth the history of this cause of action in Arkansas and it would serve little useful purpose to reiterate it here. After reciting the history, the court, through Justice Fogleman, wrote:

> We need only to abandon our strained efforts to find a tort or a theoretical physical impact or injury and the consequent tenuous reasoning in order to justify the award of damages for mental anguish. By doing so, we can and do now recognize that one who by extreme and outrageous conduct wilfully or wantonly

causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress.

It is of little consequence that different terms are used in describing the element of compensable damages involved as mental suffering, mental anguish, emotional distress, etc. Prof. Prosser sees the term mental anguish comprehensive enough to cover everything from nervous shock to emotional upset, and agrees that the words emotional distress may well be used. In his view they include all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, anger, embarrassment, chagrin, disappointment, worry and nausea. Prosser, Insult & Outrage, 66 Cal.L.Rev. 43 (1956). See also, Restatement, Torts 2d 22, § 46, Comment j. The emotional distress for which damages may be sought must be so severe that no reasonable person could be expected to endure it. It must be reasonable and justified under the circumstances. Liability arises only when the distress is extreme. Restatement, Torts 2d 78, § 46, Comment j.

By extreme and outrageous conduct, we mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. See Restatement of the Law, Torts 2d 72, § 46, Comment d.

Thus, in what this court considers to be clear terms, the Arkansas Supreme Court dictated the test that a litigant must meet in order to prevail in an infliction of emotional distress case. In the first place, the conduct by the wrongdoer must be willfully and wantonly engaged in and must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Counce, supra,* 268 Ark. at 280, 596 S.W.2d 681.

Even if the plaintiff in a case such as this meets the first part of the test, it must then be determined that "the emotional distress for which damages may be sought must be so severe that no reasonable person could be expected to endure it." *Counce, supra,* at 280, 596 S.W.2d 681.

While there might be an "argument" about whether plaintiff has met the second portion of the test, particularly in view of the law in relation to the granting of Rule 56 motions, the court believes and finds that she has clearly not met the first portion of the test. Arkansas Model Jury Instruction No. 404 (AMI Civil 2d 404), the instruction that is to be given in Arkansas state courts in any jury case in which this tort is claimed, succinctly sets forth the test that plaintiff shall meet in this respect. After first telling the jury that the plaintiff must prove that the defendant willfully and wantonly engaged in extreme and outrageous conduct, it defines those terms as follows:

A person acts willfully and wantonly when he knows or should know in the light of surrounding circumstances that his conduct will naturally and probably result in emotional distress [and bodily harm] and continues such conduct in reckless disregard of the consequences.

By extreme and outrageous conduct, I mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

The uncontroverted facts in this case show that all that the defendant did was prepare some gummed name and address labels, place them on an envelope, and then inadvertently place some teachers' score reports in the wrong envelopes. That conduct falls far short of being willful and wanton as those terms are defined by Arkansas law. It is not claimed that defendant intentionally sent plaintiff's scores to someone else and sent some other person's scores to her. There is no claim that these envelopes were willfully and wantonly mixed up or that the conduct was continued in reckless disregard of the conse-

quences. At most, it was a simple mistake the likes of which are unfortunately made almost every day in this complicated world, but even if the conduct was willful and wanton, surely it could not be said that the conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Perhaps plaintiff was more sensitive than most, as she claims she was, but that is not the test laid down by *Counce*. The conduct must be so outrageous and atrocious as to be intolerable in a civilized society. A civilized society does not find simple mistakes such as those present in this case to be atrocious and intolerable as is required by *Counce* in order for this cause of action to be sustained.

■ The court also doubts that plaintiff has met the second portion of the *Counce* test in that her deposition in the case does not show that the emotional distress which she claimed was reasonable and justified under the circumstances and so severe that no reasonable person could be expected to endure it. Her deposition indicates that after she received the test on a Friday afternoon, rather than secluding herself because of humiliation and embarrassment, she called other teachers to inquire about whether they had also received the wrong scores. Her husband, apparently at least with her acquiescence, then called the local television station and reported to that organization that Mrs. Wood had received another person's score and that some other person had presumably received hers. She didn't hide in her bedroom from humiliation and embarrassment. Instead, she agreed to an on-camera interview with a news media representative at a television station which is generally seen by countless viewers throughout western Arkansas and eastern Oklahoma. Obviously, she wanted, for whatever reason, to tell her story to all who would listen and watch. Then, the next day, she went to her daughter's ballgame. She received her scorecard the following Tuesday, and filed this lawsuit on Thursday. Those actions, in the court's view, support a finding of a motive of retribution against those who she believed had wronged her, rather than being an indication of humiliation and embarrassment.

Be that as it may, even if it can be argued that this portion of the *Counce* test is met by the facts, or at least that there is a genuine issue in relation to the facts relevant to this test, it can still not be said, as set forth above, that defendant's conduct was willful, wanton, atrocious and utterly intolerable in a civilized society.

### Invasion of Privacy

Plaintiff's second claim is based on the tort of invasion of privacy. Arkansas recognizes four types of invasions of privacy:

(1) *Appropriation,* which consists of the use of the plaintiff's name or likeness for the defendant's benefit; (2) *intrusion,* which is the invasion by one defendant upon the plaintiff's solitude or seclusion; (3) *public disclosure of private facts,* which is the publicity of a highly objectionable kind, given to private information about the plaintiff, even though it is true and no action would lie for defamation; and (4) *false light in the public eye,* consisting of publicity which places the plaintiff in a false light before the public.

*Dunlap v. McCarty,* 284 Ark. 5, 9, 678 S.W.2d 361, 364 (1984), [citing Restatement (Second) of Torts § 652A (1977)].

Although it is not clear from plaintiff's complaint or the other papers submitted by her which of the four types of invasion she claims occurred in her case, it is clear that the uncontroverted facts do not even arguably support any of the types other than the third type, public disclosure of private facts. Counsel for the parties have pointed the court to no Arkansas cases which deal directly with this type of invasion of privacy, and the court, through independent research, has found none. However, the Arkansas Supreme Court has relied, in past cases, on Restatement (Second) of Torts in cases involving other types of invasion of privacy. For example, in *Collection Con-*

*sultants, Inc. v. Bemel,* 274 Ark. 223, 623 S.W.2d 518 (1981), the court, in dealing with invasion of privacy by intrustion, relied heavily on the Restatement for guidance. In *Dunlap v. McCarty, supra,* another invasion of privacy case, the court again looked to the Restatement. For this reason, the court deems it appropriate to consider the Restatement as an aid to a proper determination of the invasion of privacy issue in this case.

In § 652D, the Restatement delineates and defines the various types of invasion of privacy in terms similar to those quoted above from *Dunlap, supra.* One of the types delineated in this section of the Restatement is the "unreasonable publicity given to the other's private life." In discussing the type of publicity that must be present to sustain such a cause of action, Comment a to this section discusses the distinction to be made between "publicity" and "publication," as follows:

"Publicity," as it is used in this Section, differs from "publication," as that term is used in § 577 in connection with liability for defamation. "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.

    \*    \*    \*    \*    \*    \*

Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.

Restatement (Second) of Torts § 652D comment a (1977).

The Court of Appeals for the Eighth Circuit, applying Missouri law, held that "publicity" means disclosure to more than one person. *Tureen v. Equifax, Inc.,* 571 F.2d 411 (8th Cir.1978). In so ruling, the court thoroughly discussed and applied the Restatement and comments quoted above. In accord with this interpretation of the Restatement is *Wilson v. Retail Credit Co.,* 325 F.Supp. 460, 463 (S.D.Miss.1971), *aff'd,* 457 F.2d 1406 (5th Cir.1971).

██ In this case there was not even any contention that the defendant, or anyone for that matter other than the plaintiff and her husband, communicated the plaintiff's scores to anyone other than the person who inadvertently received them. In short, until plaintiff called her friends, and until her husband called the news media and she appeared on a television show seen by viewers in western Arkansas and eastern Oklahoma, no one other than the person who inadvertently received her scores even knew of the mix-up. The law appears to be that it was not an invastion of plaintiff's right of privacy for her scores to be communicated to the single person who received her scores, and the defendant is certainly not responsible for plaintiff deciding to publicize this fact and make it available to the public at large, or at least to Channel 5's viewing public. The defendant simply did not, as the law requires for this cause of action to be sustained, make plaintiff's scores public and it, thus, did not invade her right of privacy.

Even if through some strained logic or reasoning this court were to decide that there was sufficient publicity of plaintiff's scores for this cause of action to have merit, it must still be found that the matter publicized is of a kind that "would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652D. The plaintiff testified in her deposition that not only did she pass but that she "did well." (Deposition, p. 19). It is difficult for this court to believe that any reasonable person would truly believe that the publicizing of a good and passing score would be highly offensive. Be that as it may, even if there is a material issue of a genuine fact in relation to whether this particularly sensitive plaintiff would find the publicizing of her scores to be highly offensive, the court, for the reasons stated above, finds without question that there is no material issue of

any genuine fact in relation to whether the publicity necessary to sustain the cause of action exists in this case.

### Conclusion

For the reasons discussed above, the court finds that there is not the slightest doubt about the facts which are necessary to a proper determination of the issues raised by the complaint in this case. For these reasons, the court, without weighing the evidence to the slightest degree, must find that there are no triable issues which exist. Under those circumstances, a Rule 56 motion should be granted. Under the circumstances, the court believes that if there was ever a case for which Rule 56 was designed, this is one of them.

A separate order in accordance with the above will be contemporaneously entered.